ANN R. LABBATE, Plaintiff, *v.* NICHOLAS J. LABBATE, Defendant.*

Supreme Court, Bronx County, February 10, 1947.

* See, also, *Hubner* v. *Hubner,* 188 Misc. 125 and *McHale* v. *McHale,* 188 Misc. 165.— [REP.

*Matthew Salonzer* for plaintiff.

No appearance for defendant.

NATHAN D. LAPHAM, Official Referee. By order dated January 10, 1947, this undefended action for annulment was referred to me as Official Referee by Mr. Justice HOFSTADTER from Special Term, Part I, Bronx County, to hear and report.

The case was heard on January 21, 1947, with no appearance by or for the defendant.

The parties were married March 26, 1946, in a civil service at Greenwich, Connecticut, and separated in August of that year. There is no issue of the marriage.

The plaintiff claims she was induced to marry the defendant by his promise that, after the civil ceremony, they would be married according to the rites of the Roman Catholic Church, a promise which he never intended, and refused, to fulfill. She testified she had been slightly acquainted with him for five or six years but the record is silent as to the nature and extent of the courtship. Both were Catholics and she tells us that before the marriage she talked with him many times about a religious ceremony and cited one evening in particular when they were at the home of her girl friend and " I brought up the subject of marrying in the Church and he said, ' Don't worry about that, we will get married in the Church '. So he said we would get married first civilly and then get married in Church." This friend also testified that they came to her home about two weeks before the marriage, asked her to stand up with them, and that, in answer to her inquiry as to whether it would be a church wedding, the defendant replied " Not right now, we are going to have a civil ceremony and later on will be married in Church." She, too, was a Catholic, consented to participate in the civil ceremony, and did not protest, saying she considered it none of her business.

Following the wedding, they lived together as husband and wife in a home of their own about five months. The plaintiff claims she kept asking him when they were to be married in church and that he always parried with " What are you in a hurry about? We will get married in Church "; that she threatened to leave him and he retorted that he didn't care whether she left him or not. Although neither parent took the stand, the plaintiff testified that her father and mother consented to the marriage and that in May she told her mother

" He puts me off every time ", referring to the church wedding, and that her mother then asked the defendant when he was going to have the religious ceremony to which he replied " Don't worry, I will get married when I am ready ". Certainly, he was not holding out much hope or promise of fulfillment by such an answer, yet the plaintiff continued to live with him and allow their marriage to ripen into a status. It went along in this way until August when the plaintiff claims, that, for the first time, he told her " he had been married before and divorced, so he could not get married in Church." The story then runs true to pattern, " Why didn't you tell me that? " and the inevitable reply, " If I told you, you would not have married me." The friend who stood up with them also testified to a conversation with the defendant after the separation in which he told her " I was married once before and I can't get married in Church " and that he thought a civil ceremony would do.

There is nothing strange or unique about this story except its shoddiness, and it would not warrant the repetition were it not for the ground upon which the action is predicated.

The parties were Roman Catholics, as was the young woman who acted as a witness and the inference is clear that the wife's parents were members of that Church. This couple were not children, the bride was twenty-two and the husband is alleged to have been married before. He was not a member of the armed forces, laboring under a furlough so brief as to preclude the publication of bans. In fact, she stated that no emergency existed necessitating a speedy marriage and she knew of no reason for dispensing with the religious service at the time other than that " He asked me. * * * He said he was in a hurry." She testified that she knew better at the time of the marriage, and realized, while living with him after the civil service, that she was not married so far as their Church was concerned.

The fact is universally recognized that, within the jurisdiction of the common-law and Ecclesiastical Courts of England, the marriage contract was originally a religious one sanctioned only by a sacramental ceremony. In an effort to harmonize conflicting views, public opinion finally crystallized into the form of statutes decreeing marriage to be a civil contract as distinguished from a religious one, reserving, however, to the duly authorized clergy the right to perform the religious ceremony within the law. While recognizing the legality of such

a civil ceremony, the Church as a whole deplores the growing practice of substituting it for the religious ritual and, in those faiths in which marriage is a sacrament, a civil marriage has no spiritual sanction.

The question is squarely before me pressing for answer. Should this plaintiff, who testified in substance that she deliberately turned her back upon one of the most sacred tenets of her Church, the sacrament of matrimony, when it interfered with her desire, now be given her freedom by resort to the faith which she so flagrantly discredited?

I am not condoning the defendant's conduct. He, too, was a Catholic, and knew the full import of his action. Furthermore, one can deceive by silence as well as by words and, if there were a previous marriage and divorce barring the way to marriage within the Church, concerning which he withheld information, he placed the plaintiff at the unfair disadvantage of deciding one of the most momentous questions of life without full knowledge of the facts. But fraud and deceit sufficient to annul a marriage must be of a character to mislead the ordinarily prudent person (*di Lorenzo* v. *di Lorenzo,* 174 N. Y. 467, 474; *Vonbiroganis* v. *Von Brack,* 64 N. Y. S. 2d 885, 887; *Borgstedt* v. *Borgstedt,* 64 N. Y. S. 2d 888, 889, on reargument original decision adhered to 188 Misc. 183). While the law does not hold one contemplating marriage to the onerous duty of checking every statement and promise of the betrothed by documentary or witness evidence, it does not permit, even in the golden days of courtship, an utter disregard of a situation which would put a reasonably prudent person on guard. It seems unbelievable that the ordinarily prudent young woman who was a practicing Catholic would not have viewed the insistence on a civil service and the indefinite postponement of the religious rites by another professed Catholic with alarm and suspicion. Surely her religious convictions were not very deep-seated when so flimsy an excuse — "He asked me. He said he was in a hurry" — was sufficient to lead her away from her Church to a Justice of the Peace. There is no evidence that she inquired into the reason for his haste or of his reluctance and refusal to be married in the Church in the beginning. She apparently did nothing in the face of his unusual proposal to resort to a civil service at variance with their mutual faith.

Moreover, although on the hearing she and her witness testified that the husband eventually told each of them of a previous **marriage and divorce, no evidence was offered on this subject.**

In order to support such a charge, the plaintiff was held to " strong, satisfactory and conclusive evidence " of such previous marriage and divorce (*Shepherd* v. *Shepherd*, 47 N. Y. S. 2d 947, 948, 267 App. Div. 917). But all we have is the reported word of the defendant to his wife, reiterated to their friend. I am not overlooking the fact that she bases her complaint on his failure to fulfill his premarital promise, and not on the previous marriage and divorce, but this subject, on which the Roman Catholic Church has taken so definite a stand, is so closely interlocked with the ability to marry within the Church, that is, with his ability to carry out the promise on which she claims she relied, that it appears to me to be matter on which the word of either party, standing alone, is insufficient " * * * without proof of the facts upon which the allegation of nullity is founded " (Civ. Prac. Act, § 1143) and vividly illustrates the wisdom of the law. If such a statement, uncorroborated by other evidence, were sufficient, anyone, wearying of the duties and responsibilities of marriage, by his word alone, could end all discussion concerning a marriage in the Roman Catholic Church and thus pave the way to freedom. The law of this State does not permit either party to a marriage contract to thus supersede the courts and public interest and alter his marriage status at will. Section 1143 of the Civil Practice Act stands as a bar to such possible imposition and collusion. (*Fowler* v. *Fowler*, 29 Misc. 670; *Steimer* v. *Steimer*, 37 Misc. 26, 30; *Feig* v. *Feig*, 232 App. Div. 172, 176; *Broad* v. *Broad*, 40 N. Y. S. 2d 258; *Rivett* v. *Rivett*, 270 App. Div. 878; *Irwin* v. *Irwin*, 69 N. Y. S. 2d 780; *Matthews* v. *Matthews*, 69 N. Y. S. 2d 875, confirmed N. Y. L. J., Jan. 11, 1947, p. 148, col. 3; *Antoniotti* v. *Antoniotti*, N. Y. L. J., June 25, 1946, p. 2509, col. 1; *Feraco* v. *Feraco*, 69 N. Y. S. 2d 652; *Zoske* v. *Zoske*, 64 N. Y. S. 2d 819.) If a previous marriage and divorce existed, doubtless proof thereof is available. As the case stands there is no such credible evidence. It may be true; it may have been advanced as a means of extricating the defendant from a tiresome situation; or as an added wedge to sunder bonds mutually irksome. All I know is that there is no satisfactory evidence on the subject before me. *Pirro* v. *Pirro* (243 App. Div. 817) illustrates the caution required in such matters. The whole case rests squarely on the plaintiff's claim of fraud through the intentional failure to fulfill his promise, a promise so fragile and unreasonable under the peculiar circumstances here, that it is difficult to understand how it could have inspired trust

and reliance in a practicing Catholic. Nothing forced the plaintiff into this civil marriage except her easy credulity and desire. She had the right to insist on a marriage within their Church or no marriage at all. This she did not do.

This is not the picture of a young couple caught up by the heightened emotions of war and imminent separation; or of a boy and girl confused and frightened by approaching parenthood. Nor was the plaintiff confronted by the difficulties which arise when the betrothed is of another faith and is thus barred from the sacraments of her Church. Here, apparently, marriage was the thing uppermost in their minds; for no plausible reason he insisted on a civil service with an indefinite promise of a religious ceremony at some time in the future; she acquiesced without hesitation or question. If, before marriage, she had been as intent on a religious service as she now contends, it would have taken a more substantial and logical reason to have swerved her from that course; if, after the wedding, she had urged a Church service as insistently as she would have us believe, she would have become alarmed by the brusqueness and nonchalance with which he pushed aside her alleged entreaties and her mother's question. But for five months she continued to live with him as his wife and enjoy the fruits of a union which she knew was rooted in sin according to the tenets of their faith. Now she seeks sanctuary and attempts to find an avenue of escape to the teachings and sacraments of the Church which she so easily and willfully ignored when they presented an obstacle to their unexplained haste. As was said in *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467, 474, *supra*): "If the plaintiff proves to the satisfaction of the court that, through misrepresentation of some fact, which was an essential element in the giving of his consent to the contract of marriage and which was of such a nature as to deceive an ordinarily prudent person, he has been victimized, the court is empowered to annul the marriage." Incidentally, in a thought-provoking opinion, Mr. Justice WALSH has written impressively upon the subject of unenforcible religious promises in *Nilsen* v. *Nilsen* (66 N. Y. S. 2d 204).

The plaintiff here has failed to convince me that the alleged promise was of primary importance to her. Her whole course of conduct argues to the contrary. As Mr. Justice WALSH said in a case where the plaintiff claimed she was deceived by defendant's promise to follow the ceremony in his Church, Episcopal, by one in her faith, the Roman Catholic: " A practical Catholic

would not consent to be married in a religious ceremony outside her own church. A solicitous Catholic mother would not approve of a marriage of her daughter in a non-Catholic ceremony. This leads the Court to the conclusion that a second religious ceremony in this case was entirely secondary and not of great importance to the plaintiff." (*Borgstedt* v. *Borgstedt*, 64 N. Y. S. 2d, 888, 889, on reargument original decision adhered to 188 Misc. 183, *supra.*)

In the case before me we have a *Catholic plaintiff*, with the consent of her *Catholic parents, marrying a Catholic* in a civil service for no adequately convincing reason. To my mind this is even more eloquent of the light esteem in which she held her Church. This is confirmed by the fact that she lived with him as his wife for five months. Under some circumstances this period would not be considered unduly long. During the war there were many young couples faced by the upheavals and uncertainties incident to service in the armed forces which frequently presented a legitimate reason for the postponement of the fulfillment of some prenuptial promise, or, at least, a plausible excuse. But there is nothing of that nature in the present case. This couple were enjoying the security of normal conditions. She entered into the civil contract obligating her to sustain the marital relationship, knowing full well that her Church did not recognize the marriage. She did not refuse to cohabit as in *Mirizio* v. *Mirizio* (242 N. Y. 74), but for five months performed her wifely duties under the civil contract without the blessing of her Church.

I believe no judge who presides over our congested matrimonial calendars can escape the conviction that resort to the process of annulment is frequently based on a desire for freedom from marital bonds which one spouse, if not both, find irksome and uninteresting, rather than because of any fundamental fraud striking at the roots of the contract. This growing tendency indicates that the moral sense of no inconsiderable portion of our people has been so dulled as to be insensible to the importance and sacredness of the marriage contract. As was said by Mr. Justice WENZEL: "The strictures of the divorce laws of this State have caused many unhappy spouses to bring annulment actions as a way out of their troubles and the number of these cases is growing daily." (*Taylor* v. *Taylor*, 181 Misc. 306, 307.) The duty rests on the Bench to weigh each case to determine whether it is honestly within the law, or is a sham carefully tailored and camouflaged to cir-

cumvent and defeat the law. (*Taylor* v. *Taylor, supra*; *Borgstedt* v. *Borgstedt, supra*; *Zoske* v. *Zoske*, 64 N. Y. S. 2d 819, *supra*.)

The alacrity with which unhappy, impatient and disillusioned spouses, either singly or in concert, are now beating a well-traveled pathway to the halls of justice in confident expectation of release based upon the most fictitious, trivial or obviously shallow claims is causing alarm and confirms the wisdom of the court in the warning voiced as early as 1906: " * .*. * it is time that all right-minded people, the servants of the law as well as its ministers, should put up the bars * * * " (*Richardson* v. *Richardson*, 114 N. Y. S. 912, 917) against such encroachments upon the spirit as well as the letter of the statute under which this relief is sought.

Today we hear so much about the burden and the restrictions incident to the rearing of children and the unwillingness of one spouse or the other to be circumscribed by these so-called " handicaps ", and too little about the essential purpose of marriage which " * * * is the establishment of the conventional home and family, with children, the unit * * * upon which society is established." (*Rubman* v. *Rubman*, 140 Misc. 658, 669.) The present laws were " * * * not enacted to help those who so recklessly disregard their lifelong interests and the importance of stability of marriage in the life and the happiness of the nation." (*Girshick* v. *Girshick*, 44 N. Y. S. 2d, 432, 434.) If the hour has struck when public sentiment demands a liberalization of the matrimonial laws of this State, such should be accomplished by legislative fiat rather than by judicial edict.

This couple happened to be members of the Roman Catholic Church but the same principle obtains in all cases where a plaintiff, in stubborn disregard and willful disobedience of the sacred tenets of her faith requiring a sacramental marriage, resorts to a civil ceremony and pursues the marital relation thereunder until, for some reason irked by her contract, she claims she has just discovered deception, cries " fraud, fraud ", and seeks refuge in the teachings of the Church she has disregarded to lift her out of her predicament. To my ears these cases sound suspiciously hollow and lack the clear ring of truth and sincerity. Each should be scrutinized by the court with unusual diligence.

In my opinion the instant case is but another where a plaintiff is attempting to use the Church whose rules and canons

she ignored and dishonored to release her from an unsatisfactory experiment in matrimony, and to stretch "judicial naïvete" to the point of recommending a decree on such facts would, to all intents and purposes, be opening the door to trial or companionate marriage.

I recommend that the complaint be dismissed. Findings have been passed upon.

*(On motion to disaffirm report, March 31, 1947.)*

McGeehan, J. Motion is denied. The learned Official Referee's report is confirmed and adopted in all respects and the complaint is accordingly dismissed. The complaint contains no allegations as to fraud perpetrated by virtue of failure to disclose a prior marriage and as to such cause of action this dismissal is without prejudice to the plaintiff's right to institute a new action thereon if so advised.