MAX FEIG, Respondent, v. REGINA ROZA FEIG, Appellant.

First Department, May 1, 1931.

*Louis Waldman* of counsel [*Elias Lieberman* with him on the brief; *Waldman & Lieberman*, attorneys], for the appellant.

*Joseph E. Weil* of counsel [*Herman G. Wolin* and *Charles Gold* with him on the brief; *Joseph E. Weil*, attorney], for the respondent.

MERRELL, J. Plaintiff and defendant were married at Sigid, Rumania, on July 8, 1928. Plaintiff and defendant were second

cousins. At the time of their marriage plaintiff was thirty-six years of age, and defendant nineteen years of age. The evidence indicates that, as was quite customary in Rumania, plaintiff's proposal to marry defendant was conveyed through the intervention of defendant's father, whom plaintiff first approached on the subject. Having received the father's approval of the proposed alliance, plaintiff then went to call upon defendant at the home of defendant's grandfather at Roddo, Czechoslovakia, a short distance from the home of defendant's father. Plaintiff gave the improbable testimony that on the first occasion when he met defendant he asked her if she loved him and if she was willing to marry him, and that defendant replied that she did love him and was willing to marry plaintiff. This, defendant upon the trial denied, testifying that the proposal of marriage was made entirely by her father, who advised her to marry plaintiff, and that subsequently she consented to such union. Plaintiff in his complaint asked that the marriage be annulled upon the grounds that defendant had stated to him that she loved him, and would, therefore, consent to become his wife, and that later defendant repudiated such profession of affection and stated to plaintiff that she never had loved him. It was primarily by reason of such fraud that plaintiff sought to have the marriage between the parties annulled. After the marriage of the parties they lived and cohabited together as husband and wife at the home of defendant in Rumania for a period of three or four weeks, when plaintiff returned to the United States, where he had lived for twenty years prior to returning to Rumania, and subsequently obtained a *visa* to bring defendant, his wife, to this country, furnishing her with necessary money for that purpose. Defendant landed in the United States on December 20, 1928. She was met at the pier by plaintiff and his brother. On the way from the pier to the apartment which plaintiff had prepared for the reception of defendant, defendant stated that she was ill, and plaintiff testified that she looked bad — so much so that plaintiff testified that he offered to procure a doctor if she wished one. In the same apartment where plaintiff had planned to live with defendant, a brother of plaintiff and his wife also lived. Plaintiff's sister-in-law had prepared a meal for plaintiff and his wife. As to what occurred after reaching the apartment of plaintiff's brother and sister-in-law the evidence is in dispute. Plaintiff testified that when defendant reached the apartment she began to cry and stated that she was homesick for her mother; that when defendant continued to cry, she then stated to him that she wished to tell plaintiff something, and then stated to plaintiff that she did not love him and did not want to live with him, and that when he

asked her why she married him if she did not love him, defendant replied that she wanted to come to the United States, and that she had only married plaintiff for the purpose of avoiding the quota to come to this country. Two brothers of plaintiff and plaintiff's sister-in-law testified in corroboration of plaintiff in almost the same words as those used by plaintiff as to this conversation as to her reason for marrying plaintiff. Defendant, on the other hand, testified at the trial that when she came to the apartment which plaintiff had prepared for her and as she sat down upon the edge of the bed to arrange her hair, plaintiff attempted to have sexual intercourse with her, and that she then told plaintiff that she could not permit of that at that time because she was not well and was menstruating, and that plaintiff replied that that was nothing, and that defendant then stated: " It is not as you say that it would be nothing. For sanitary reasons as well as religious reasons such is not right." That plaintiff then attempted to force defendant, and she began to cry, whereupon plaintiff became very angry, and said: ".Who says that this is not allowed, who has the right over you. No one has anything — no one has any say over you except I who am your husband."

Defendant then testified that she commenced to cry, and plaintiff started cursing her, saying that he wished the ship had sunk with her; that as the result defendant cried and became hysterical. There is no question upon the evidence of the witnesses sworn in behalf of plaintiff that after plaintiff and defendant came from their apartment and were about to eat the meal prepared for them, defendant was crying and hysterical. Jennie Feig, sister-in-law of plaintiff, testifying in plaintiff's behalf, stated, with reference to defendant's actions on this occasion: " She began to holler, she made noise, it was about five hours, she wanted to throw herself out of the window, I held her back. After she ran to the door my brother-in-law said ' Please take care of her, she should not run in the street.' * * * I was afraid she would kill herself. * * * She was like crazy." Morris Feig, a brother of plaintiff, testified in this respect, that defendant was crying and continued crying.

It seems to me that the evidence clearly shows the truth of defendant's testimony. The fact that plaintiff, his two brothers and his sister-in-law all testified to the highly nervous and hysterical condition of defendant furnishes convincing proof that plaintiff was responsible for the condition under which defendant was suffering. If defendant was the cool, designing person that the testimony of plaintiff and his kinspeople would indicate, and that she coolly informed plaintiff and his relatives that she did not love plaintiff

and had married him for the sole purpose of gaining entrance into this country, and had plaintiff manifested the kindness to her which he and his witnesses profess, there was no occasion for the defendant to become hysterical. Her nervousness and hysteria were not sham. There is no claim on the part of any witness that it was. Plaintiff and his witnesses all agree that it was with difficulty that defendant was restrained from throwing herself out of the window. I think such circumstances clearly corroborate defendant in her testimony that she cried and became nervous and hysterical because of the insistence on the part of plaintiff that she submit to his advances at a time when, according to her religious training and for sanitary reasons, the action was improper, and that thereupon plaintiff became abusive, tried to force defendant, and finally stated that he wished the ship on which she came to the United States had sunk with her. A cousin of defendant, with whom defendant was unacquainted, was called in an attempt to quiet defendant, and the cousin testified that she found defendant in a hysterical condition and, being unable to quiet her, was told by plaintiff's kinspeople and by plaintiff to take her away. This the cousin did without taking defendant's bag or belongings with her. Five days later plaintiff, having retained a lawyer, brought the present action to annul the marriage between the parties on account of the fraud of defendant in telling plaintiff prior to their marriage that she loved him.

In my opinion, the additional ground urged by plaintiff that defendant had married plaintiff for the sole purpose of evading the immigration restrictions imposed by this country was an after-thought, and that the evidence of plaintiff in support of such claim is unworthy of belief. No good reason is shown why defendant, then little more than a child, should wish to leave her native land, her family and friends, and come to this country, where she had no acquaintances. Defendant testified that the only reason she came was that she loved plaintiff and had become his wife. The action of plaintiff in bringing action at once and without any honest effort on his part to win back the affections of defendant which his brutality had forfeited, indicates very clearly that plaintiff was disappointed in the alliance that he had contracted and, perhaps, angered at defendant's refusal to yield to his embraces, impetuously rushed into court in an effort to be rid of her. On an application to reduce alimony plaintiff stated: " I desire to convey to the court's mind the fact that I am still willing to support the defendant if she will return and live with me. However, in spite of my requests for her to return she has emphatically refused to do so. I respectfully urge this court to take cognizance of these facts

and aid me in my attempt to materially reduce the alimony granted my wife." Such professions on the part of plaintiff are quite unworthy of belief in the light of the fact that five days after defendant landed in this country plaintiff had hired a lawyer and brought his action to annul the marriage. On cross-examination during the trial defendant was asked: " Q. Do you really wish to live with your husband now? The Witness: If he will be kindly and friendly to me, I will be."

A reading of the evidence in this case convinces me that the findings of fact made by the court upon which the judgment appealed from was granted, that defendant did not love plaintiff, nor did she intend to live with him as his wife, and that she married him for the sole purpose of gaining admission to the United States and evading the immigration laws, and that upon her arrival in this country defendant refused to live with plaintiff, telling him that she did not love him, and that she only married him to enable her to come to this country, are clearly against the weight of the evidence, and that as matter of law there was no sufficient evidence to warrant such findings of fact. Furthermore, the decree appealed from appears to have been granted upon the sole declaration or confession of defendant that she had been guilty of a fraud in telling plaintiff that she loved him and that her only reason for marrying him was to obtain entrance into the United States. I do not think the declarations or confessions of defendant to which plaintiff and his witnesses testified furnish sufficient proof to justify the decree of annulment. Section 1143 of the Civil Practice Act specifically provides that " In an action brought to annul a marriage, a final judgment annulling the marriage shall not be rendered by default for want of an appearance or pleading, or upon the trial of an issue, without proof of the facts upon which the allegation of nullity is founded. *The declaration or confession of either party to the marriage is not alone sufficient as proof, but other satisfactory evidence of the facts must be produced.*" (Italics are the writer's.) In short, in order to justify a decree of annulment there must be some evidence other than the mere declarations or confessions of one of the parties to the marriage. In the case at bar defendant categorically denied that either of the alleged declarations attributed to her was made by her. Such confessions or declarations alleged to have been made by defendant were entirely uncorroborated by any other proof, and were, it seems to me, insufficient, under the provisions of section 1143, to justify the granting of a decree of annulment. In other words, aside from declarations which the Civil Practice Act states are not alone sufficient as proof, there is an entire absence of " other satisfactory evidence." (See, also,

*Steimer* v. *Steimer*, 37 Misc. 26, opinion by Mr. Justice CLARKE, formerly presiding justice of this court.)

So far as I am aware, the courts of this State have never granted a decree annulling a marriage, after consummation by the cohabitation of the parties, upon any such grounds as those urged by plaintiff. (*Schaeffer* v. *Schaeffer*, 160 App. Div. 48; *Griffin* v. *Griffin*, 122 Misc. 837; affd., 209 App. Div. 883.) The only grounds of fraud alleged in the complaint were that consent of plaintiff to said marriage was obtained by fraud, and that prior to the marriage defendant had represented to plaintiff that she loved him and would, therefore, consent to become his wife, and that in fact, at the time of making such representations, she did not love him, nor did she at the time of the consummation of the marriage, or prior thereto, love him, and that the only reason she married plaintiff herein was to enable her to enter this country as plaintiff's wife. In *Schaeffer* v. *Schaeffer* (*supra*) the opinion of the Appellate Division, Second Department, was written by Mr. Justice CARR, and in such opinion, in which the entire court concurred, Justice CARR stated: " This is a tragic case for the young woman involved, but the sole question is whether she discloses sufficient facts to justify an annulment of the marriage on the ground of fraud. At the time of her marriage with the defendant she was about twenty-one years of age. She had met him at a dance. He appeared to have been attracted towards her, for he asked leave to call upon her. Between February, 1912, and April eleventh of the same year, she met him about twice a week at her home. They went out for walks and strolls. He told her that he loved her, and that he fell in love with her at first sight. He brought her flowers. On the Sunday before April eleventh he proposed marriage to her. She asked him if he loved her enough to marry her, considering the short time he knew her, and he said that he did. On April eleventh they were married before a minister. He took her to a hotel in Brooklyn, where the marriage was consummated. He told her that he would make arrangements to hire a flat, a ' kitchenette,' ' five rooms.' After she left the hotel with him she spoke about the ' kitchenette ' and he told her not to worry; that he would call on her on the following Sunday, and that they would go out and look for a ' kitchenette,' etc. On the following Sunday he came to her house and told her he did not love her; never did love her and never intended to love her, and insisted that she should get a divorce from him. The case is a cruel one on its face; in fact cruel enough to tempt a disturbance of the judgment of those who are fathers of daughters. *But I think we have not yet arrived at a legal*

*stage which requires an annulment of a marriage because one party or both parties were untruthful to each other in their mutual protestations of all-consuming and undying love. Marriage is yet a status on which depends the idea of a family, and on which in turn has arisen the structure of civilization as we know it.*

" *The judgment should be affirmed.*" (Italics are the writer's.)

At the trial of the case of *Griffin* v. *Griffin* (*supra*) Mr. Justice LAZANSKY, the present presiding justice of the Appellate Division, Second Department, stated (at p. 843): " If, as a matter of law, a decree could be granted under the facts set forth in this complaint, then no longer is marriage a sacred institution. Until final authority speaks further on the subject I shall adopt the following rule: Before consummation and the ripening into a status, any fraud, had it not been perpetrated, the marriage would not have taken place, is material to it and the marriage may be annulled. *After consummation and development of the relationship into a public status, the fraud is not material,* unless it goes to the *essentialia* of the contract. The acts, conditions or situations which may be included within the term *essentialia* of the marital relationship are not readily stated. Many have been so included, others may be. Its scope may be broadened by some courts. It will suffice here to say that plaintiff's claim does not." (Italics are the writer's.)

Justice LAZANSKY's opinion was unanimously affirmed by the Appellate Division, Second Department (209 App. Div. 883). In the case at bar, following the marriage of the parties, there was consummation of such marriage by cohabitation for three weeks.

While the courts of this State have frequently annulled marriages contracted through fraudulent representations of material facts, I know of no case where an annulment has been granted under circumstances such as those presented in the case at bar. There have been cases where, to induce marriage, there have been representations that a party has never been addicted to the use of narcotics, when, in fact, the party making such representations was a drug addict. There have been other cases where there have been representations that a party is in sound bodily health, whereas, in fact, he was suffering from an incurable venereal or other loathsome disease, or where, after marriage, a party learns that there is some physical impediment to the marriage into which he or she has been led by the representations of the other party that there was no existing obstacle to the free consummation of the marriage. Such representations, however, were of existing material facts bearing directly upon the marriage state and the health and happiness of the party who was misled thereby into contracting the marriage. In such cases our courts have set aside the marriage upon the

application of the party defrauded. So far as I have been able to discover, our courts have never annulled a marriage because of a mere change of mind or for a misrepresentation of a mental state. Except in cases where there were misrepresentations of existing material facts, the courts have never decreed an annulment. I do not believe that the sacred institution of marriage may be thus readily dissolved and set aside. This unfortunate defendant, having consented to marry plaintiff, a man nearly twice her age, left home and kindred and came to this country to join her husband, and was met with a most unhospitable reception by plaintiff and his kinspeople. Short of showing that defendant was the sophisticated and designing person that the evidence of plaintiff and his kinspeople would indicate, I think defendant, upon the evidence, was clearly shown to be a timid and retiring person and deserving of better treatment than she received.

I think the judgment appealed from is contrary to the evidence and contrary to the law, and should be reversed, with costs, and plaintiff's complaint dismissed, with costs to appellant against respondent.

FINCH, P. J., and SHERMAN, J., concur; O'MALLEY and TOWNLEY, JJ., dissent.

O'MALLEY, J. (dissenting). The gravamen of the action is that the defendant falsely and fraudulently represented to the plaintiff that she loved him sufficiently to marry him and to leave her home and family in Rumania and come to live with plaintiff in America; that such representation was not true and made with intent to deceive and defraud plaintiff and to induce him to marry the defendant, in order that she might gain admission to this country by means of preferential *visa*.

The plaintiff's evidence, if believed, was ample to sustain the cause of action. Plaintiff's conduct subsequent to the marriage clearly evinces the fullest reliance by him upon the defendant's representations. Following his return to the United States he contributed in excess of $500 towards the defendant's support and the expense necessary to bring her to New York. He rented and furnished an apartment and put it in readiness to receive the defendant upon her arrival.

Concededly, the parties separated a few hours after the defendant arrived. The cause for the separation was the chief issue for determination by the learned justice at Special Term. He had opportunity to see, hear and observe the demeanor of the witnesses before him, and his findings in favor of the plaintiff may not lightly be disturbed. The responsibility for determining where

the truth lay rested upon the trier of the fact, rather than upon this appellate tribunal. As was recently said by the Court of Appeals in *Boyd* v. *Boyd* (252 N. Y. 422, 429): " In a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. * * * How can we say the judge is wrong? We never saw the witnesses. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal. If these witnesses imposed upon the credulity of an experienced fact finder, this court cannot correct him. His was the opportunity, the responsibility and the power to decide."

In my view the probabilities were entirely with the plaintiff. It is inconceivable that after such an expenditure of money and effort upon his part he would have cast off the defendant and driven her from the apartment which he had prepared as their home, for the reasons advanced by the defendant. Far more probable is the plaintiff's explanation for the parting that resulted so soon after the defendant's arrival. The justice at Special Term was warranted in finding that the defendant had accomplished her design when she reached New York. If this were so, it is not unreasonable for the defendant immediately to have given notice to the plaintiff that she would have nothing further to do with him. Her guilty conscience and the knowledge that she was required to make confession of her guilt offered sufficient explanation for her excitement and hysteria.

True it is that the marriage was consummated in Rumania. While consummation in cases of annulment is a matter to be considered and one that under appropriate circumstances may influence the court in its decision, it still remains that it is the consent and not the consummation or cohabitation which is the important part of the contract of marriage. In the case before us there is no question of public policy involved because of the consummation. The consummation and cohabitation were had only while the parties were living abroad. Such was but one of the fraudulent acts perpetrated by this defendant to attain her end.

The plaintiff was not required to rely wholly upon the testimony of himself and his relatives. That the defendant intended an ultimate separation from him finds support in the evidence of the witness Nemet, who visited the defendant's family in Rumania after the plaintiff had returned to New York. In a conversation had with the defendant's mother in the presence of the defendant,

the former inquired about the laws governing American divorce, and whether or not it was difficult to obtain a divorce here. While the witness testified that the defendant appeared to protest against the line of inquiry conducted by her mother, the justice at Special Term might well have drawn the inference that the inquiry was made for the defendant's benefit.

The judgment here is not based upon defendant's admission solely, but upon all the facts and surrounding circumstances. Here, separation from the plaintiff was an accomplished fact within a few hours after her arrival in New York. Her explanation for the cause was not binding upon the trial justice, who had a right to disbelieve the defendant and accept the plaintiff's explanation. Moreover, this was a contested issue and not a default judgment.

The case is clearly distinguishable from the authorities cited in the prevailing opinion. (*Schaeffer* v. *Schaeffer*, 160 App. Div. 48; *Griffin* v. *Griffin*, 122 Misc. 837; affd., 209 App. Div. 883.) Here the plaintiff desired to marry one who would return with him to America and live with him here. He was much older than the defendant and it was quite natural that he would be apprehensive lest she would consent to marry him for an ulterior motive, namely, to seek preference under the Immigration Law to which she would be entitled as plaintiff's wife. With this in mind the plaintiff made specific inquiry as to the defendant's real attitude towards him and was assured by her that she was marrying him because of her love for him and not for the purpose of gaining admittance to the United States. The justice at Special Term was wholly warranted in finding that a deliberate fraud was practiced upon the plaintiff and upon all the evidence was fully justified in granting this decree of annulment.

I, therefore, vote for affirmance.

TOWNLEY, J., concurs.

Judgment reversed, with costs, and complaint dismissed, with costs. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of facts proved upon the trial as are necessary to sustain the judgment hereby awarded.