EVELYN DE BAILLET-LATOUR, Respondent, *v.* ALEXANDRE DE BAILLET-LATOUR, Appellant.

Argued February 27, 1950; decided October 12, 1950.

*I. Maurice Wormser* for appellant.  I. Plaintiff's judgment of annulment is predicated upon proof which is insufficient as a matter of law, and constitutes an affront to every dictate of the natural law, sound morals and wise public policy.  (*Great Northern Ry. Co.* v. *Johnson,* 254 F. 683; *Ex Parte Suzanna,* 295 F. 713; *Dalrymple* v. *Dalrymple,* 2 Hagg. Con. 54; *Lindo* v. *Belisario,* 1 Hagg. Con. 216; *Jackson* v. *Winne,* 7 Wend. 47; *Maynard* v. *Hill,* 125 U. S. 190; *Bunim* v. *Bunim,* 298 N. Y. 391; *French* v. *McAnarney,* 290 Mass. 544; *Matter of Case,* 214 N. Y. 199; *Taylor* v. *Taylor,* 181 Misc. 306; *Gabriel* v. *Gabriel,* 274 App. Div. 141.)   II. In view of the complete absence of any satisfactory evidence of the facts upon which plaintiff's simulated allegation of nullity was founded, as required by section

1143 of the Civil Practice Act, the complaint should have been dismissed. (*Lederkremer* v. *Lederkremer*, 173 Misc. 587; *Feig* v. *Feig*, 232 App. Div. 172; *Gabriel* v. *Gabriel*, 274 App. Div. 141; *Anonymous* v. *Anonymous*, 69 Misc. 489; *Hall* v. *Hall*, 139 App. Div. 120.)

*Sol A. Rosenblatt, Julian B. Rosenthal* and *Charles Roden* for respondent. I. The judgment was based upon defendant's fraudulent misrepresentations as to his intention to consummate the marriage, and not merely upon the fact of such non-consummation. II. Defendant's fraudulent misrepresentations that he would consummate the marriage entitled plaintiff to a judgment of annulment. (*di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467; *Fundaro* v. *Fundaro*, 272 App. Div. 825; *Coppo* v. *Coppo*, 163 Misc. 249; *Mirizio* v. *Mirizio*, 242 N. Y. 74; *Herrman* v. *Herrman*, 93 Misc. 315, 176 App. Div. 914.) III. Defendant's misrepresentations as to his future intentions constituted a ground upon which plaintiff was entitled to judgment. (*Adams* v. *Gillig*, 199 N. Y. 314; *Watkins* v. *Watkins*, 197 App. Div. 489; *Costello* v. *Costello*, 155 Misc. 28; *Ottinger* v. *Bennett*, 144 App. Div. 525, 203 N. Y. 554; *Smith* v. *Smith*, 112 Misc. 371; *Weill* v. *Weill*, 104 Misc. 561; *Schulman* v. *Schulman*, 180 Misc. 904; *Churchill* v. *St. George Development Co.*, 174 App. Div. 1; *Gregory* v. *Binghamton Trust Co.*, 168 App. Div. 805, 220 N. Y. 626.) IV. The credible evidence fully corroborates plaintiff's proof of defendant's fraudulent misrepresentations. The Court of Appeals may affirm upon any grounds upon which the trial court could have granted an annulment. (*Feig* v. *Feig*, 232 App. Div. 172; *Gabriel* v. *Gabriel*, 274 App. Div. 141; *Yates* v. *Yates*, 211 N. Y. 163; *Winston* v. *Winston*, 165 N. Y. 553, 189 U. S. 506; *Svenson* v. *Svenson*, 178 N. Y. 54; *Rutstein* v. *Rutstein*, 221 App. Div. 70; *People ex rel. Witherbee* v. *Board of Supervisors*, 70 N. Y. 228; *People ex rel. Sweet* v. *Lyman*, 157 N. Y. 368; *Corr* v. *Hoffman*, 256 N. Y. 254; *Forrest* v. *Forrest*, 25 N. Y. 501; *Boyd* v. *Boyd*, 252 N. Y. 422.)

Desmond, J. Of the three alleged causes of action pleaded in the complaint in this action for annulment of a marriage, two have been dismissed below, and are out of the case. There remains the first cause of action only, which charges defendant with fraud (see Civ. Prac. Act, § 1139; Domestic Relations Law, § 7) in that he, it is alleged, induced plaintiff to marry him,

by falsely representing to her that he would cohabit with her and perform the customary duties of the married state, whereas, it is alleged, he never intended to carry out those promises and in fact failed and refused, after marriage, to fulfill them. The trial court believed the testimony of plaintiff (which was supported by some circumstantial evidence to which we will refer) that defendant refused to have, and never did have, sexual intercourse with her. The trial court thereupon made findings that this refusal by the husband was in pursuance of his premarital fraudulent intent not to perform the marital act, and granted a judgment of annulment, which has been affirmed by the Appellate Division, and is now before us by leave of the Appellate Division.

The only point argued to us by defendant-appellant is as to the alleged legal insufficiency of the proof on which this marriage has been declared to be void. This court is, of course, without any power to review the weight of evidence or to pass on the truthfulness of the witnesses. If the evidence makes out a prima facie case for annulment under New York law, we must affirm.

A determination as to the sufficiency of the proof here requires us to answer three questions: first, was there evidence as to each of the requisite elements of the fraud; second, is section 1143 of the Civil Practice Act applicable here; and third, if section 1143 be applicable, were its requirements satisfied here? We give an affirmative answer to each of those queries.

Plaintiff, to make out the fraud alleged, had to prove a premarital representation by defendant that he intended to perform the duties of the married state, that the representation was willfully false and that plaintiff relied thereon in consenting to marry defendant. As to the making of such a representation, we have here not only the traditional implication thereof from the very entry into the marriage contract (*Moore* v. *Moore,* 94 Misc. 370, 373; *Coppo* v. *Coppo,* 163 Misc. 249, 256; see *Mirizio* v. *Mirizio,* 242 N. Y. 74, 81), but we have more, since plaintiff testified to premarital statements and attitudes of defendant which could be construed as promises of a normal marriage relationship. Such a false statement of intent· was a statement of material, existing fact (see *Adams* v. *Gillig,* 199 N. Y. 314, 322), and concealment of a contrary intent was fraudulent (*Svenson* v. *Svenson,* 178 N. Y. 54, 57). The falsity

of that representation could be inferred (taking plaintiff's testimony as true, as we must on this appeal) from defendant's refusal at any time to have sexual intercourse with plaintiff, and from his several explanations of his reasons therefor. Plaintiff, according to her, relied on that false representation in consenting to marry defendant, and brought this suit only when she became convinced that defendant had never intended to perform. Thus there was testimony, taken as true by both courts below, of each of the essential ingredients of fraud.

The second question of law here presented is as to the applicability, to this case, of section 1143 of the Civil Practice Act: " § 1143. *Proof required for judgment by default in action to annul a marriage.* In an action brought to annul a marriage, a final judgment annulling the marriage shall not be rendered by default for want of an appearance or pleading, or upon a trial of an issue, without proof of the facts upon which the allegation of nullity is founded. The declaration or confession of either party to the marriage is not alone sufficient as proof, but other satisfactory evidence of the facts must be produced."

At first glance, that statute, from its heading and from the word " default " in its first sentence, might seem to confine itself to undefended cases, and this lawsuit was vigorously defended. However, we have concluded from the section's history and from decisions applying it, as well as from investigation as to its purpose, that its meaning is this: the first sentence forbids the grant of an annulment judgment solely by reason of default in pleading or appearance, but requires proof, and the second sentence states the rule as to what that proof must consist of. The historical basis for that conclusion is set out in Judge FROESSEL's opinion here. We add this: section 1143 of the Civil Practice Act, as it now stands, is identical, except for slight grammatical alterations, with the first two sentences of old section 1753 of the Code of Civil Procedure. The heading of section 1753 was " Certain proceedings regulated in action to annul marriage ", and the word " default " did not appear in that heading. When the Code of Civil Procedure was revised into the Civil Practice Act the revisers recommended a new section 1157 of the Civil Practice Act, which, as finally numbered, became the present section 1143 of the Civil Practice Act. The 1919 report of the Joint Legislative Commission on Simplification of Civil Practice (N. Y. Legis. Doc., 1919, No. 111)

states that the new Civil Practice Act section is the same as the old code section " without change of substance ", but, unfortunately perhaps, the revisers put the word " default " into the heading. However, especially in the light of the historical matter given by Judge FROESSEL in his opinion, it seems plain that what the old section and the new section meant was that annulments could not be granted by default, but that there must be proof and that the proof must contain satisfactory evidence in addition to the declarations or confessions of the parties, a requirement as to proof which would be applicable whether or not the defendant contested the case. Going further back into statutory history, we find that section 1753 of the old code was drawn, in part, from Revised Statutes of New York, part II, chapter VIII, title 1, section 36, which read as follows: " No sentence of nullity of marriage shall be pronounced solely on the declarations or confessions of the parties, but the court shall, in all cases, require other satisfactory evidence of the existence of the facts, on which the allegation is founded." For many years this statutory mandate has been held, or assumed, to control contested, as well as noncontested, annulments (*Hall* v. *Hall*, 139 App. Div. 120, 123; *Feig* v. *Feig*, 232 App. Div. 172; *Gabriel* v. *Gabriel*, 274 App. Div. 141; see *Lyon* v. *Lyon*, 62 Barb. 138). One of the purposes of these enactments was, undoubtedly, to prevent collusion by demanding that there be evidence from persons other than the parties. However, collusion is possible in an ostensibly contested case as well as in a default. We conclude that the second sentence of section 1143 governs all annulment actions, and that it requires, in all annulment actions, other proof in addition to the " declaration or confession of either party ".

Our last inquiry, then, is as to whether the present record contains, in addition to such declarations or confessions, " other satisfactory evidence of the facts ". Plaintiff gave evidence as to all the essential elements of fraud, and her son corroborated her as to certain admissions, or " confessions ", made by defendant. The " other proof " pointed to by plaintiff consisted of this: defendant, who insisted that he had had normal physical relations with his wife on many occasions, was asked whether she had any conspicuous scars on her body, which he denied. The existence of such scars was then demonstrated.

That, of course, was not proof of defendant's fraudulent intent. It did no more than impugn defendant's truthfulness, without in itself proving or disproving his asserted cohabitation with his wife. However, it seems to us, that it was, in the meaning of section 1143 "other satisfactory evidence of the facts". That language must be construed according to its purpose and, so construed, it requires only that there be in the record, in addition to "declarations" or "confessions" of the parties, other material from other sources, substantial and reliable enough to satisfy the conscience of the trier of the facts (see *Winston* v. *Winston,* 165 N. Y. 553, 556, 557, affd. 189 U. S. 506). It follows that the requirements of the second sentence of section 1143 were met by the proofs offered by plaintiff on the trial of this case.

All of the judges of this court deplore the indiscriminate granting of annulments on insubstantial grounds or flimsy "proof". But here there was evidence, accepted by the courts which have power to pass on the facts, of a deliberate fraud as to a fundamental of marriage. " * * * the refusal of husband or wife without any adequate excuse to have ordinary marriage relations with the other party to the contract strikes at the basic obligations springing from the marriage contract when viewed from the standpoint of the State and of society at large " (*Mirizio* v. *Mirizio,* 242 N. Y. 74, 80–81, *supra*). Even canon law, strict as it is as to the indissolubility of marriages, grants decrees of nullity in cases such as this (see Woywod, Practical Commentary on the Code of Canon Law, p. 654; Woywod, The New Canon Law, p. 219; Ramstein, Manual of Canon Law, p. 443).

The judgment should be affirmed, with costs.

FROESSEL, J. (dissenting). Plaintiff has been awarded a final judgment annulling her marriage to defendant upon the ground of fraud. The fraud is said to consist of defendant's *implied* premarital fraudulent representation that he would cohabit and " engage in normal marital relations " with plaintiff, and that he willfully failed to consummate the marriage. At the time of the trial, plaintiff was over fifty-nine years of age, defendant fifty-three. They had been living together, holding themselves out to the world as husband and wife, and sharing the same bedroom for seven months.

After the entry of the interlocutory judgment, defendant moved that it be set aside and the case opened for the purpose of taking *further testimony,* as well as for related relief, which motion was subsequently denied. Inasmuch as the motion was not an application for a *new* trial, and no appeal was taken from the order of denial, nor is said order specifically mentioned in the notice of appeal, we do not consider that branch of the record (Civ. Prac. Act, § 580).

Two additional causes of action for annulment pleaded in plaintiff's supplemental complaint were dismissed by Special Term, from which determination no appeal has been taken. One of said causes was based on defendant's misrepresentation that he had sufficient means to support plaintiff, as to which the court, in an oral opinion rendered immediately following the close of the trial, held that the " representations were not of a sufficiently material nature to warrant an annulment under the circumstances here present." The remaining cause was based on defendant's misrepresentations that he was a member of a famous European family, had a substantial family inheritance — a great fortune — and a family chateau in France of international renown; as to this cause, Special Term said: " If our courts were to lend themselves to the annulment of marriages upon any such ground they would be making a mockery of the institution of marriage." The Appellate Division unanimously affirmed Special Term, but granted permission to appeal on unspecified questions of law.

We need therefore consider only the first cause of action dealing with defendant's premarital fraudulent intent not to consummate the marriage, and its alleged nonconsummation. The question before us is whether the evidence is legally sufficient to sustain the decree of annulment. In turning to a consideration of the evidence in this case, we have no disposition to deal with the facts beyond those necessary to indicate the reasons for our conclusion.

This was plaintiff's third marital venture. She first married at the age of twenty-eight in 1917, her then husband being nearly twice her age. A son was born of that marriage in 1918. She divorced her husband in Nevada in 1939 when he was seventy-six years of age. Less than five months after the divorce, she remarried, but her second husband died about two years later, leaving her upwards of $350,000. She married this defendant

on August 2, 1945, when she was fifty-six years of age, at which time she had an annual income of $15,000, in addition to an allowance from her first husband, the amount of which she stated she did not know.

Defendant is six years younger than plaintiff. He was born in Holland, and in due time was graduated from the Leyden University School of Law. He became a member of the Netherlands Bar, and practiced law in Holland from 1929 to 1939. In the latter year he came to the United States, following two previous visits to this country, and has remained here ever since. He too had been previously married, and has three children of said union. He also secured an uncontested divorce against his first wife in January, 1933. After coming to this country, he studied law from 1942 to 1945, passing the New York State Bar examinations in October, 1944. He became a naturalized citizen on January 8, 1945 and was admitted to our Bar in June, 1945.

According to plaintiff, she met defendant in January, 1943. He proposed to her in June, 1945, and they were married on August 2, 1945. During this period she had seen him some twenty-eight times. When they first met, both lived at the Waldorf-Astoria Hotel. Shortly thereafter, she moved to an apartment on the same floor and in the same wing where the defendant resided. She subsequently invited him to her apartment, to her country home in Connecticut, to various functions where he met some of her lawyer and business acquaintances, and she had a horoscope prepared for him. She conceded he was " very demonstrative " and " very, very affectionate ", and expressed " ardor and affection " for her " completely "; she found him " a desirable lover ". They had been to her country home twice before the marriage when he was the only guest. He had not given her an engagement ring, but she herself had one made up after the marriage.

Plaintiff testified that from the time of their marriage until she left defendant on March 14, 1946, during which period they lived together continuously, no act of sexual intercourse between them took place. On their wedding night and the night following, he kissed her and was " very demonstrative ", but she said they slept in separate rooms. She was " very tired ", and thought he was " chivalrous ". During their twelve-day honeymoon at her country home, they had no servants, but the dress-

maker came in three days after the wedding, and the gardener's daughter came in to do chores. On August 14th, they returned to the hotel, where they shared a bedroom with twin beds, and a living room. On August 17th, she gave him $10,000 in cash to pay the rent for their hotel apartment and other expenses.

According to her testimony, they discussed the subject of their marital relations " many times." The first conversation took place the very month of their marriage. At that time defendant was already urging her to sell her real estate; " there was constant conflict." In their second talk, a few weeks later, he spoke of their marriage as a " spiritual one ". The third conversation took place during the 1945 Christmas season, when she complained that the marriage had " never been consummated." At that time she had " very high blood pressure ", was " very ill ", and was having medical attention. She never told her physician that she had no marital relations with defendant. In January, 1946, she went to a hospital, remaining over two weeks, and received surgical ministration for an old condition that had required medical attention over a period of many years. Defendant visited her at the hospital and telephoned " constantly."

She then told of a further conversation in February, 1946, concerning their marital relations, in the course of which defendant said: " ' Well, why should. I have intercourse with someone who doesn't trust me? If you don't trust me in your financial things, how would I trust you as a wife? ' " Certainly then, if not before, he had, according to her testimony, made his position clear; yet she continued to remain with him, stating that she took his word that he was sick, that she wanted to make the marriage a success; and that " he always was so very affectionate and everything; but the financial thing was what he kept at me constantly about * * * because he wanted me to sell all my property." In January they discussed a trip to Palm Beach, Florida, but she did not wish to go. In February they visited her friend in Providence, Rhode Island; he came into her room, but she went to another bed, because " he had been drinking." During the same month she signed a joint passport application with him for a European trip.

In March, very shortly before their separation, she signed an affidavit " agreeing to stand up for his son Erik who was coming in from the Dutch East Indies ", and procured a letter

from her banker to accompany said affidavit. When asked whether she did this with full knowledge that defendant had not supported her and was making demands upon her for money, she replied: " He was going to support me very soon, with big money." The final conversation took place during the first half of that same month. They " were constantly quarreling "; he was pressing her to sell her real estate and to go with him to Holland, and when she declined, he said, according to her: " ' I want you to understand this, that you are constantly bringing up this question of the consummation of the marriage. That marriage will never be consummated until [your first husband] dies and my wife dies. Then we will be married in the Catholic Church.' " It is significant that though she was nominally an Episcopalian and he nominally a Catholic, the evidence disclosed that neither one attended the church of her or his faith, that each had previously procured a divorce, and that defendant had married his first wife by a civil ceremony not followed or preceded by any religious ceremony.

She left him on March 14th, to visit her son, who was studying law at Yale, and never returned to their marital home. In her bill of particulars plaintiff claims that she discovered the falsity of defendant's representations " from time to time during the period between the dates of her marriage to, and separation from, the defendant, and finally was convinced of their falsity on or about March 24, 1946 ", despite the earlier conversations above referred to.

Plaintiff's son also testified. He admitted that on occasion he stayed at the apartment of the parties and slept on the couch in the living room while they slept in the bedroom, and on one occasion he saw them " dressed for bed "; on other occasions he would come in late. Because of his separation from his own wife, he was living with his mother at the time of the trial. He was also associated with her attorney in the practice of law, doing the " leg work " in this case. He also testified that defendant, his stepfather, told him that the marriage had not been consummated, and that defendant also made substantially the same statement to him as was testified to by his mother, namely, that the marriage would not be consummated until defendant's first wife and plaintiff's first husband had died, and a religious ceremony had been performed. It should be noted that these alleged admissions to plaintiff and her son make no reference to premarital fraudulent intent.

At this stage of the case all that the record contained as to the first cause of action—the only one with which we are here concerned—consisted of the declarations of plaintiff and the alleged " admission " of defendant. At the close of plaintiff's case, defendant moved to dismiss upon " the ground that the plaintiff has wholly failed in fact and in law to make out a prima facie cause of action " for annulment, which motion was denied and exception duly taken. Later, however, the trial court recognized the weakness of plaintiff's case when it dismissed the second and third causes of action, and indicated that on this evidence alone it " would have had genuine difficulty　＊　＊　＊ in reaching a conclusion awarding to the plaintiff a decree of annulment upon the first cause of action."

It will serve no useful purpose to review defendant's evidence. Much of his testimony dealt with the second and third causes of action, which are not now before us. He vigorously denied that there was no consummation of the marriage, and claimed that the parties had marital relations not only during their honeymoon in Connecticut, but in the hotel bedroom they shared for seven months. He also denied that he had made the aforesaid admissions to plaintiff or to her son. When asked whether he had observed any scars and other physical imperfections on plaintiff's person, he responded as to his observations, what he noted " when we had intercourse ", but stated that he did not notice any scars.

Plaintiff then called in rebuttal a physician who examined plaintiff that very week, more than two years after their separation. He testified as to his observations, and particularly with respect to four scars. It was this testimony which induced the trial court to conclude that plaintiff had made out her first cause of action, for it said: " I want to say frankly that until the advent of [the doctor] upon the witness stand this morning, my mind was torn with extreme doubt as to whether or not the plaintiff had established her first cause of action sufficiently to enable the Court to find that there had been, as claimed by her, deliberate failure and refusal on the part of the defendant to consummate the marriage. The plaintiff's testimony on that issue was quite forthright. The defendant's contradictory testimony on that issue was equally forthright."

It further stated that under the rule of " fair preponderance ", it would have denied plaintiff relief on her testimony,

and even with the testimony of her son, it would have had " genuine difficulty " in deciding for plaintiff, and then added: " To sum it up, the testimony of [the doctor] decidedly establishes the plaintiff's case upon her first cause of action by a preponderance of the credible evidence."

It is quite apparent from the foregoing that, without the testimony of the physician, plaintiff would not have been awarded judgment, and properly so. The trial court probably had in mind section 1143 of the Civil Practice Act, which, so far as pertinent here, provides: " The declaration or confession of either party to the marriage is not alone sufficient as proof, *but other satisfactory evidence of the facts must be produced."* (Emphasis supplied.)

This statute has been held to apply to contested as well as uncontested actions (*Feig* v. *Feig,* 232 App. Div. 172; *Gabriel* v. *Gabriel,* 274 App. Div. 141), and is but the reiteration of a rule which comes to us from the ecclesiastical courts of England, which had jurisdiction in matrimonial matters prior to 1858 (20 & 21 Vict., ch. 85). Among the canons ratified at the Convocation of Canterbury in 1603, we find canon 105, providing as follows: ''Forasmuch as matrimonial causes have been always reckoned and computed among the weightiest, and therefore require the greater caution  *  *  * we do straitly charge and enjoin, that in all proceedings to divorce and nullities of matrimony, good circumspection and advice be used  *  *  * and *that credit be not given to the sole confession of the parties themselves, howsoever taken upon oath, either within or without the court."* (Emphasis supplied.) (*Devanbagh* v. *Devanbagh,* 5 Paige 554, 555; 2 Burn on Ecclesiastical Law 503; 1 Phillimore on Ecclesiastical Law 640.) In 1829, our Legislature embodied the rule in the Revised Statutes in the following language: " No sentence of nullity of marriage shall be pronounced solely on the declarations or confessions of the parties; but the court shall, in all cases, require other satisfactory evidence of the existence of the facts, *on which the allegation of nullity is founded."* (Emphasis supplied.) (Rev. Stat. of N. Y., part II, ch. VIII, tit. 1, § 36.) In 1836, Chancellor WALWORTH applied the rule in the annulment action of *Devanbagh* v. *Devanbagh* (*supra*). It later became part of the Code of Civil Procedure (§ 1753) in the language of the present statute. Thus, it has been the law in England and in this State for three and one-half

centuries, and is the law today (Civ. Prac. Act, § 1143; 9 Carmody on New York Practice, § 82, pp. 114–115; *Feig* v. *Feig, supra; Gabriel* v. *Gabriel, supra; Weiman* v. *Weiman,* 295 N. Y. 150; 2 Bishop on Marriage and Divorce [6th rev. ed.], §§ 240–241).

The question thus presented is whether the physician's testimony is such " *other satisfactory* evidence of the *facts* ", and sufficient in the eyes of the law. It will be recalled that this testimony was offered in rebuttal for the purpose of impeaching the credibility of defendant when he said that he had not seen the scars. It does not touch directly upon the premarital fraudulent intent of defendant, nor does it, in our opinion, satisfactorily establish nonconsummation here.

In a case such as this, the law requires, among other. things, that there be a material representation, that it be made with *premarital fraudulent intent,* and that it be false. It is true that the representation may be implied in the marriage contract (see *Mirizio* v. *Mirizio,* 242 N. Y. 74, 80–81; *Coppo* v. *Coppo,* 163 Misc. 249, 256). As to the fraudulent intent, the evidence must show that it existed at the time the marriage contract was entered into. No subsequently formed intent is sufficient. We have here no direct evidence of premarital fraudulent intent, and Special Term in its opinion made no reference whatever to this requirement; it referred only to nonconsummation. Fraud is not presumed, but we do not mean to say that in an appropriate case, where nonconsummation without adequate excuse is satisfactorily proven, the court may not infer therefrom premarital fraudulent intent. However, inasmuch as the representation may be implied and the premarital fraudulent intent may under such circumstances be inferred, it becomes of paramount importance that the evidence of nonconsummation be, to say the least, " satisfactory " as required by the statute.

But here, in addition to implying the representation of a promise to cohabit, we are asked to infer that because defendant states he did not see the scars on the person of plaintiff during the few months of their marriage, they had not one act of sexual congress, and from that inference further infer that he had a premarital fraudulent intent not to cohabit. There is no reasonable basis for such a finding in the record before us, since the evidence as to the scars was not " satisfactory evidence of the *facts* ", i.e., premarital fraudulent intent and noncon-

summation, and the trial court indicated it was not satisfied with the evidence of plaintiff and her son.

Plaintiff testified that she was "always rather reserved"; that during the more than seven months of their married life, she never exhibited her person to defendant, that she was never completely undressed in his presence, nor did she see him undressed; indeed, she denied she was in his presence in a night-gown "excepting in bed", and asserted she never went into his bed. It follows, therefore, that she, by her own voluntary action, never exhibited her scars, and one can readily understand why, like any average woman, she would wish as far as possible to conceal rather than expose them. Moreover, these people were no longer young; she was a grandmother, he the father of three grown children; marriage was no novelty to them; and plaintiff was not in excellent physical condition, as hereinbefore indicated. We recognize that the secrets of the bedchamber are difficult to substantiate by witnesses, but this difficulty confronts a defendant as well as a plaintiff.

We are not here concerned with an ordinary fact situation as to which parties give conflicting testimony, and which may as readily be true as false. We are dealing with the realities of human nature, and the exceedingly strong implications that flow from the association of a man and woman, husband and wife, who concededly demonstrated their ardor and affection for each other in a variety of ways, held themselves out to the world as a normal married couple and actually lived together continuously, sharing the same bedroom, for seven months, without any obstacle — legal, moral or physical — to consummation.

No court would hesitate for a moment on these facts to grant a divorce on the ground of adultery to a spouse of either of these parties, if they were not husband and wife. But here they are, with every right to engage in marital relations, and yet it is said they did not. Upon this record, every human probability cries out against the claim of nonconsummation, and even more so when the ulterior motives ascribed by plaintiff to defendant, a lawyer, who knew the importance of consummation, are accepted as true. Plaintiff's claim does not merely shatter credibility; we simply do not have here the "*other satisfactory* evidence of the *facts*" which the statute says "*must* be produced" (Civ. Prac. Act, § 1143).

The general rule in civil cases is that a plaintiff must prove his case by a preponderance of the evidence, and, in some cases, "to make out a preponderance, the evidence should be clear and convincing" (*McKeon* v. *Van Slyck*, 223 N. Y. 392, 397). Our courts, as well as eminent text writers, have said that evidence in support of an annulment must be such as to constitute proof of a clear and definite, credible, convincing and satisfactory character, in respect of every factor required to make out a situation calling for such relief (*Gabriel* v. *Gabriel*, 274 App. Div. 141, *supra*; *Feig* v. *Feig*, 232 App. Div. 172, *supra*; 9 Carmody on New York Practice, § 81; *Woodward* v. *Heichelbach*, 97 N. J. Eq. 253; 3 Nelson on Divorce and Annulment [2d ed.], § 31.64; 35 Am. Jur., Marriage, § 88; 55 C. J. S., Marriage, § 58, subd. c). Our statute specifically requires that the " other evidence " be satisfactory. It does not define " satisfactory evidence ", but in *Buffalo Loan, Trust & Safe Deposit Co.* v. *Knights Templar & Masonic Mut. Aid Assn.* (126 N. Y. 450, 453), we said that these words mean " with reasonable definiteness and certainty ". Clearly the " other evidence " as to nonconsummation and premarital fraudulent intent was not " satisfactory " within the meaning of the statute. This is not merely a rule " for the guidance of the judicial conscience " (*Winston* v. *Winston*, 165 N. Y. 553, 556, affd. 189 U. S. 506), but a *statutory* rule of evidence.

The record here makes it abundantly clear that each of the parties sought material advantage from the other, and, failing in their objectives, the marriage simply did not succeed. Our law, however, does not regard marriage lightly, and such contracts may not be abrogated, as other contracts, at the will of the parties themselves, merely because they do not get along or because they have made a mistake. Although marriage in this State is regarded as a civil contract (Domestic Relations Law, § 10), it is " of a peculiar character and subject to peculiar principles. * * * There are, in effect, three parties to every marriage, the man, the woman and the State " (*Fearon* v. *Treanor*, 272 N. Y. 268, 271–272). As we said in *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467, 472): " It, certainly, does differ from ordinary common-law contracts, by reason of its subject-matter and of the supervision which the state exercises over the marriage relation, which the contract institutes. In such respects, it is *sui generis.*"

Despite the complacent attitude towards marriage found in many quarters today, its importance to the State, the nation and civilization cannot be overemphasized. In *Bunim* v. *Bunim* (298 N. Y. 391, 394), we quoted with approval from *Maynard* v. *Hill* (125 U. S. 190, 205): " ' Marriage, as creating the most important relation in life,' has ' more to do with the morals and civilization of a people than any other institution ' ".

To allow a dissolution of the marriage upon the evidence disclosed by this record would tend to open even wider a door that is already ajar for the indiscriminate granting of countless annulments where an absolute divorce could not be obtained on the statutory ground. It is the public policy of our State that in divorce actions a husband and wife may not testify against each other on the statutory issue. In an annulment action they may, but it is also the public policy of our State in adopting a rule centuries old that in such an action " other satisfactory evidence of the facts must be produced " in addition to the declaration or confession of either party. Since our laws permit annulments only upon stated grounds, the courts are not at liberty to disregard the statutory mandate as to the character of evidence required.

Applying such requirement to the evidence contained in this record, we are of the opinion that the defendant's premarital intent to commit a fraud and his failure to consummate the marriage have not been established by satisfactory proof under the law. It is insufficient in the eyes of the law, and insufficient evidence is no evidence. The proof does not reach the point where conflicting inferences may be reasonably drawn (*Matter of Case*, 214 N. Y. 199, 203; *Blum* v. *Fresh Grown Preserve Corp.*, 292 N. Y. 241). Accordingly, the order and judgment appealed from should be reversed and the complaint dismissed.

LOUGHRAN, Ch. J., LEWIS and FULD, JJ., concur with DESMOND, J.; FROESSEL, J., dissents in opinion in which CONWAY and DYE, JJ., concur.

Judgment affirmed. [See 301 N. Y. 778; 302 N. Y. 600.]