NORMA SCHUMER, Plaintiff, v. ALVIN SCHUMER, Defendant.

Supreme Court, Special Term, Kings County, February 25, 1954.

*Harold J. Robbins* for plaintiff.

*J. Murray Harris* for defendant.

McDonald, J. This is an action to annul a marriage pursuant to section 1143 of the Civil Practice Act. A verified answer denying the essential allegations of the complaint was interposed. However, at the time of the trial, the answer was withdrawn and a stipulation, not a part of the record but made with the knowledge of the court, was entered into between the parties.

No alimony or counsel fee is sought by the plaintiff wife. It is within the atmosphere of this mutually satisfactory arrangement that this litigation was tried.

The only witnesses called were the plaintiff and her mother. The former testified that she and the defendant became engaged to marry in the Christmas season of 1951, after a three-month courtship while she and the defendant were still college students, the plaintiff being then in her junior year. Shortly prior to the engagement, while both were examining a photograph album in the plaintiff's home and in the presence of the plaintiff's parents, the defendant is alleged to have said " we would have a large family and that we would even do the family album one better. We would have six children.'' To which the plaintiff replied that " that was just what she wanted and she was glad he would *try*.'' While similar conversations were had at other times, they were substantially the same, and it is upon this conversation that the plaintiff principally relies to establish the defendant's false and fraudulent representations. To put it most euphemistically, this testimony taxes the credulity of the court. It is difficult to believe that well-bred college students, not yet formally engaged, would so seriously and frankly discuss " *trying* " to have children, particularly while within earshot of the parents of one of them, or that if there was a discussion of having " six children,'' it was of a serious nature and not merely facetious banter. It is even more difficult to believe that this was the inducing cause of the marriage of these young people just out of their teens rather than the mutual attractions of young love.

The natural and expected end of marriage being the procreation of children, such intention need not be expressed and would be presumed and, although not expressed, could still serve as a basis for an action of this type. (*Eldredge* v. *Eldredge*, 43 N. Y. S. 2d 796; *Schulman* v. *Schulman*, 180 Misc. 904; *Mirizio* v. *Mirizio*, 242 N. Y. 74; *Miller* v. *Miller*, 132 Misc. 121.)

Shortly after the engagement was announced a party was given in honor of the young people at the newly acquired home of relatives at Spring Valley, New York. While returning to New York the defendant is alleged to have said that he would obtain and furnish a similar home where they could raise their family. This is the second of the alleged false and fraudulent representations upon which plaintiff relies. Such a promise must, we believe, be viewed in the light of common sense and experience. It is common knowledge that every young swain builds a castle in Spain, but few ever reach the brick and mortar

stage. And, were they held accountable therefor, no marriage would be safe, and the hopes and dreams to which young lovers are prone would have to be scrutinized by a polygraph or other lie-detecting instrument rather than the traditional rose-colored glasses.

To establish the falsity of these promises we must again rely solely upon the testimony of the plaintiff and her mother. The plaintiff testified that on their nuptial night, April 6, 1952, the defendant insisted upon using a contraceptive over her protestations and she recalled to his mind that if they were to have six children they would have to start soon. Apparently, the usual bashful approach of the newly married bride was completely lacking in this twenty-year-old college student who was bent upon immediately getting on with the work of procreating six children. At the risk of being accused of naiveté, the court is most incredulous. Similar conduct on the part of the defendant is alleged to have continued throughout the married life of the parties, always, of course, over the objections of the plaintiff.

The plaintiff also alleges that the defendant never provided her with the home he had promised and that although they leased an apartment and resided in it together for some months, it was furnished only with kitchen furniture supplied by the plaintiff's parents and a couch which opened into a bed. During this period both the plaintiff and the defendant continued to be students although the defendant was at least nominally a partner in his father's business and derived his principal income therefrom. He also acted at times as a substitute teacher in the public school system.

The alleged practices of the defendant and his failure to provide an adequate home led to the separation of the parties in January of 1953.

Shortly after the separation the defendant visited the plaintiff at her parents' home, at which time the following conversation took place: " ' What happened to the children that you said you would try to have with me, and what happened to the home that you said you would give to me; where are those things that you promised me before we were married,' and Alvin said that the only reason he promised that to me was because he knew I wouldn't marry him unless he would give me those things."

When the plaintiff's counsel asked for further elaboration the following colloquy took place:

" Q Can you address yourself again, for the purpose of the Court hearing your testimony in greater detail, to that final conversation that took place with Alvin Schumer in the latter

part of January, 1953? What did Alvin Schumer say to you regarding his intentions? A That night?

" Q Yes. A He said that his intentions were not — he did not — he said he would not have married me — I am confused. May I start again? He said that I would not have married him if he would not have promised to have given me — given me those promises."

One would almost be convinced that these young people have familiarized themselves with the decision in *Coppo* v. *Coppo* (163 Misc. 249) and other similar cases before their engagement was formally announced or at least before this conversation took place. The plaintiff's mother in substance repeats the testimony of the plaintiff as to the incidents of the picture album and Spring Valley trip as well as the alleged admissions of the defendant that his representations were false when made and were only made to induce the plaintiff to marry him. Does such a record comply with the requirements of section 1143 of the Civil Practice Act, and what is the responsibility of the court in determining not only the quantity of the proof, but also the quality and weight to be given it?

In the instant case there is a dearth of evidence from any source other than the statements of the plaintiff and her mother and the admissions of the defendant. The fact that the defendant's admissions were testified to by both the plaintiff and her mother gives them no added weight. They still remain the defendant's admissions and they do not satisfy the conscience of the court as the trier of the facts. The Legislature, in adopting section 1143 of the Civil Practice Act, must have intended the court to act as a sieve and screen out the true from the false, the credible from the incredible, rather than to act as a sponge to absorb all the testimony offered without rejecting any of it. If the court were to act otherwise, an electronic recorder would serve as well as a judge.

Fraudulent intent must be clearly proved before a decree will be granted. *Bentz* v. *Bentz* (188 Misc. 86, 87) was a case wherein the plaintiff sought to annul a marriage on the ground that the defendant made a fraudulent promise to have children. At page 87, the court stated as follows: " Claims of this character are being presented to the courts of this State in ever-increasing numbers, largely by those who cannot or will not, for various reasons, resort to the statutory ground for divorce. This subterfuge, so apparent in many recent cases, if permitted to persist, will inevitably tend to belittle the institution of marriage and bring discredit upon the courts. The least the court can do is

scrutinize such claims with great care to the end that no marriage shall be annulled except upon clear and convincing proof of all the essential elements.''

While there are decisions enunciating the principle that the court must accept the positive testimony of an unimpeached and uncontradicted witness and that such testimony cannot be disregarded by the court or jury arbitrarily or capriciously, yet the rule does not apply with equal force where the witnesses are interested. In the *Matter of Sebring* (238 App. Div. 281, 289), the court stated: '' the court is never bound to give full faith and credit to the evidence of an interested witness, even though he is not directly impeached, or his testimony is uncontradicted. The credibility of such a witness must be determined as a question of fact. (*Gildersleeve* v. *Landon,* 73 N. Y. 609; *Brooklyn Crosstown R. R. Co.* v. *Strong,* 75 id. 591; *Wohlfarht* v. *Beckert,* 92 id. 490, 497, 498.) ''

In this case the court is called upon to determine whether '' other satisfactory evidence of the facts '' has been established which would compel the court to grant the plaintiff the relief sought.

We are not dealing here with an ordinary civil contract. What we are dealing with here is a contract of marriage which has been and still is regarded by our present-day civilization as being sacred. While it is true that the court has equity jurisdiction to annul a marriage contract based upon fraud, the fraud which will induce a court to set aside a contract of marriage is something different from the fraud which will induce the court to set aside an ordinary contract. In *Butler* v. *Butler* (204 App. Div. 602, 605), the court stated as follows: '' The contract of marriage is something more than a mere civil agreement between the parties, the existence of which affects only themselves. It is the basis of the family, and its dissolution, as well as its formation, is a matter of public policy in which the body of the community is deeply interested, and it is to be governed by other considerations than those which obtain with regard to any ordinary civil contract *inter partes.* For that reason the courts have been strict in laying down and in maintaining rules as to the annulment of this contract, and in requiring a somewhat higher degree of proof before permitting it to be set aside for fraud, than is requisite for the annulment of ordinary contracts.''

The crux of the matter in this case is whether or not the court which had the opportunity to observe the demeanor of the witnesses is compelled as a matter of law to accept their testimony because the same is unimpeached and uncontradicted and that

besides such testimony is there other satisfactory evidence of the facts required by section 1143 of the Civil Practice Act. In *Boyd* v. *Boyd* (252 N. Y. 422, 429), the court, in speaking about the sufficiency of evidence in an annulment action, and the weight to be attached to the testimony of a witness, stated as follows: " The judge heard the sound of his voice and gazed upon his countenance and tells us that he believes the witness spoke the truth. * * * How can we say the judge is wrong? We never saw the witnesses. No worldling could read the printed lines before us without pausing to reflect that such things as they recount do often happen. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal. If these witnesses imposed upon the credulity of an experienced fact finder, this court cannot correct him. His was the opportunity, the responsibility and the power to decide."

In *De Baillet-Latour* v. *De Baillet-Latour* (301 N. Y. 428, 434), the court, in construing section 1143 of the Civil Practice Act, stated: " However, it seems to us, that it was, in the meaning of section 1143, ' other satisfactory evidence of the facts.' That language must be construed according to its purpose and, so construed, it requires only that there be in the record, in addition to ' declarations ' or ' confessions ' of the parties, other material from other sources, substantial and reliable enough to satisfy the conscience of the trier of the facts (see *Winston* v. *Winston,* 165 N. Y. 553) ". This was again repeated in *Woronzoff-Daschkoff* v. *Woronzoff-Daschkoff* (303 N. Y. 506).

It thus appears that the other satisfactory evidence of the facts as required by section 1143 of the Civil Practice Act has by judicial interpretation been construed to be not a rule of evidence but a rule for the guidance of judicial conscience. This principle of law with reference to a marital action was enunciated in the case of *Winston* v. *Winston* (165 N. Y. 553, affd. 189 U. S. 506), and has been referred to in the most recent cases in the Court of Appeals concerning the subject matter.

In *Hochman* v. *Hochman* (68 N. Y. S. 2d, 886, 894), the rights and duties of the court were stated as follows: " Of course, it is true that ' The positive testimony on an unimpeached, uncontradicted witness cannot be disregarded by court or jury arbitrarily or capriciously.' *Lomer* v. *Meeker,* 25 N. Y. 361, 363, which was an action on a note where the defense was usury but which has been followed in annulment actions. But this does not mean that an Official Referee or any judicial officer is compelled by law, as a mechanical robot, to sit hermetically sealed, impervious to all light of truth from surrounding circumstances,

the documentary evidence, the interest of witnesses and their demeanor, the probabilities, and the whole record. If he does not act capriciously or arbitrarily, he may reject what he reasonably believes to be false testimony."

Having observed witnesses and their manner of testifying, and being aware of the adjustments made between the parties which resulted in the withdrawal of the verified answer on the day of trial, which answer had categorically denied the essential allegations of the complaint upon which it is now asked to act, the court is satisfied that the plaintiff has failed to establish her right to the relief prayed for and accordingly the complaint is dismissed.