ALFREDA C. RICHARDSON, Plaintiff, *v.* ERNEST A. RICHARDSON, Defendant.

Supreme Court, Special Term, Bronx County, February 16, 1951.

*Cora T. Walker* for plaintiff.

*Livingston L. Wingate* for defendant.

NATHAN D. LAPHAM, Official Referee. By order dated December 8, 1950, Mr. Justice DICKSTEIN referred this uncontested action for annulment to me as Official Referee to hear and report. The hearing was held on January 22, 1951.

Plaintiff testified that she and the defendant had known one another, and kept company, for three years prior to their marriage in a religious ceremony, January 30, 1949; that on May 30, 1948, she received her engagement ring and at that time he told her she would not have to work following their marriage, and they talked about where they would live, that they wanted two sons, names for the hoped for offspring, about bringing them up and sending them to private schools. She claims that on their honeymoon and after, her husband used contraceptives, explaining that he did not then have sufficient money to warrant having a family and he wanted both of them to work and save, to speed the day they would have a place of their own and could afford children; she said she " understood that " and they continued to work along together for a year, when she again questioned him and he then advocated waiting until they had an apartment. When they received word that an apartment was available, she testified she brought up the subject of children yet again, and that, for the first time, he informed her he did not want children at all and had told her to the contrary to induce her to marry him, with no intention of keeping his promise. She then left him on July 1, 1950, and returned to her mother's home. She said he called on her July 4th following, and asked her to come back but that, in answer to her inquiry as to whether his attitude had changed, he replied, " No, we will wait until the end of the year before we start having a family ", and that, when she refused to return under

that condition, he told her he had married her to be a companion and not the father of her children. She claims she has not cohabited with him since she left in July, and that they never had normal relations free from the use of contraceptives.

Plaintiff's mother corroborated her daughter as to the premarital conversation, and testified the defendant at that time said he would like to get an apartment in Pelham Bay up in Westchester as he didn't want to raise children in the Bronx and wished to have two boys. She said she did not know anything was wrong between this couple until her daughter returned to her home July 1st and told her she had left her husband because they could not get along. The mother testified her daughter did not state the specific reason for the separation, but that on the fourth the defendant came to the house and talked with his wife in her presence, stating " he wanted to go along without children, he was very happily married at that time "; that he was only working part time and wanted the plaintiff to continue in her job; that " he didn't want any children * * * was not ready to have children " and " if she couldn't be his wife, he wished his ring back ". Evidently the mother left them alone for a time, because she testified that, when she " came up " her daughter ran into the bathroom and the defendant said " I am going away "; that, when her daughter came out of the bathroom, she was crying, her lips were bleeding and she said he forced the ring from her hand and would say nothing more, " but lay on the bed and cried the whole afternoon ".

On this record, has the plaintiff made out a cause of action?

Nearly three hundred fifty years ago the Convocation of Canterbury recognized that " matrimonial causes have been always reckoned and reputed among the weightiest, and therefore require the greater caution when they come to be handled and debated in judgment ". The terrifying increase in such cases now passing through our courts makes these words even more poignant today. Since 1664, when the Colony of New Amsterdam was metamorphosed into the Colony of New York under the English, our law governing annulment has stemmed directly from that of the mother country, down to and including the present statutes. Section 1132 of the Civil Practice Act provides: " An action may be maintained to procure a judgment declaring the nullity of a void marriage or annuling a voidable marriage."

The Legislature went further and defined the proof required to gain this relief in section 1143 of the same act: " In an

action brought to annul a marriage, a final judgment annulling the marriage shall not be rendered by default for want of an appearance or pleading, or upon a trial of an issue, *without proof of the facts* upon which the allegation of nullity is founded. The *declaration or confession* of either party to the marriage *is not alone sufficient* as proof, *but other satisfactory evidence of the facts must be produced.*"

The most troublesome cases instituted to annul a marriage are those based on fraud (Domestic Relations Law, § 7). A reading of the case law having to do with such actions reveals that the major questions in the minds of jurists are directed to the nature, character and extent of the " other satisfactory evidence of the facts " which section 1143 states must be produced.

Obviously, the legislative intent behind this salutary enact-- ment was to safeguard a legitimate remedy, and to prevent the unscrupulous from using it as a means of taking the law into their own hands. Without some such protection, any couple, who for any reason however trivial, wished to be freed from the marital bonds, could decide on an alleged fraud, join in pro- claiming it, and thus make a mockery of the State, the courts and society. Annulment appeals to the popular mind more strongly than absolute divorce in that it does not bear the stigma of the ugly charge of adultery (the sole ground in our State), and the foreign decree is both inconvenient and burden- some, not to say ineffective and futile in many instances. Then, too, the requirements for procuring an annulment have been more easily met than in the case of divorce, since an action to annul does not seal the lips of the complaining spouse as to the heart of the issue. The fruits of annulment are not only pres- ent freedom, but release *ab initio,* and life begins anew with the granting of such a decree. An analysis of the unending pro- cession of annulment actions on the calendars of our courts, gives rise to the conviction that many persons who would not stoop to frame a false charge of adultery, fall prey to the temptation of magnifying premarital assurances and postmar- ital words and acts to satisfy the technical requirements of the law, thus shielding themselves from the necessity of disclosing the real cause of the rift — causes which all too often are but minor discords that would not serve as a key to open the legal door to freedom.

I would not be understood as saying that there are not many actions to annul a marriage based on honest and substantial claims of fraud. The difficulty encountered by plaintiff and

defendant alike is that the pertinent facts, particularly in cases grounded on marital relations, are almost exclusively a part of the private lives of the husband and wife, hidden from the world in the seclusion of the bedchamber, with little evidence available other than such words and declarations of the parties as may reach the ears of strangers to the controversy, and the acts and circumstances surrounding such statements. In fact, it is conceivable that many reserved and sensitive persons are forced to endure grievous fraud because of the reticence in disclosing their intimate marital secrets, while those not so retiring give loud voice to their complaints in co-operative assemblages and lay the groundwork for the familiar pattern of cases parading through the courts. And these marital discontents seem to expect the Bench to approach their problems with the same nonchalance and unconcern, the same disregard of the public weal, the seriousness of marriage vows, and even the facts, as often mark the thinking of the litigants. It is the task of sifting the sincere and truthful from the sham and fabricated that taxes the conscience and the analytical powers of the court. Moreover, fraud is not a term which can be conveniently packaged in a definition. It is as varied as human experiences. Therefore, the court has the twofold duty of determining whether the fraud complained of in a specific case is such as would mislead a reasonably prudent person under the circumstances there prevailing, and, if so, of whether the existence of the fraud and deception has been proved. After a plaintiff has detailed the acts and words of the defendant on which the alleged fraud is predicated, then a witness or witnesses are sworn for the purpose of corroboration. Naturally, they can testify only to what they heard or saw and to the circumstances and situation which led up to and surrounded the acts or declarations, and the court must then decide whether such testimony furnishes that '' other satisfactory evidence of the facts '' which, together with proof of the declaration or confession, meets the standard set by section 1143.

In a recent case, decided October 12, 1950, the Court of Appeals had before it the alleged legal insufficiency of proof in a contested action where a judgment of annulment had been granted by the trial court and unanimously affirmed by the Appellate Division (275 App. Div. 909), with permission, however, to appeal (275 App. Div. 1025). Stressing that it was powerless to review the weight of evidence or pass on the truthfulness of the witnesses, the court held that the denial by

defendant of the existence of any conspicuous scars on plaintiff's body, the presence of which was demonstrated, did not constitute proof of his fraudulent intent and was not conclusive on the question of his asserted normal relations, but added (*de Baillet-Latour* v. *de Baillet-Latour,* 301 N. Y. 428, 434): "However, it seems to us, that it was, in the meaning of section 1143 ' other satisfactory evidence of the facts '. That language must be construed according to its purpose and, so construed, it requires only that there be in the record, in addition to ' declarations ' or ' confessions ' of the parties, other material from other sources, substantial and reliable enough to satisfy the conscience of the trier of the facts (see *Winston* v. *Winston,* 165 N. Y. 553, 556, 557, affd. 189 U. S. 506). It follows that the requirements of the second sentence of section 1143 were met by the proofs offered by plaintiff on the trial of this case."

Judge FROESSEL, in a strong dissenting opinion in which two of his colleagues concurred, would hold litigants to a more narrow and stricter interpretation, and maintained that the evidence as to scars presented through a physician was "not ' satisfactory evidence of the *facts* ', i. e., premarital fraudulent intent and nonconsummation " (pp. 441–442), which the statute says *must* be produced, and, therefore, that the judgment should be reversed and the complaint dismissed. While there is considerable in that case, such as the age of the parties, the modest, retiring nature and ill-health of the plaintiff, and the emphasis both litigants appear to have placed on financial advantage, which might raise a question as to the genuineness of the alleged fraud in the mind of one not privileged to hear and see the witnesses, nevertheless, the majority opinion (p. 432) " (taking plaintiff's testimony as true, as we must on this appeal) ", took the broader view that *circumstantial evidence which gives realistic support to the facts is enough, even though it does not penetrate to their core.* Perhaps no more precise clarification is possible. This opinion is in harmony with the consistently followed principle of judging each case on its merits and always requiring " other satisfactory evidence of the facts " commensurate with the strength or weakness of the declarations from which the fraud is spelled. Certainly, it is serving the very useful purpose of stimulating the thinking of the Bench and Bar as to the exact meaning of section 1143. Mention of it was made in a very late case in which the complaint was dismissed. There the plaintiff presented the same two witnesses to corroborate her testimony of defendant's premarital promise

to live with her normally that children might be born, and his postmarital confession that he did so to induce her to marry him with no intention of fulfillment. The Official Referee stated that he accepted the testimony of the corroborating witnesses as truthful, but said: "In the case at bar we have *only* the defendant's admission or confession that he intended to perpetrate a fraud on the plaintiff when he made the promises to which reference has been made. The testimony of plaintiff's two witnesses is no corroboration of that fraud. It is nothing more than cumulative in establishing the truth of plaintiff's testimony that defendant made these postmarital statements to her. Their testimony simply proves that defendant made the declarations or confessions to which plaintiff testified, and nothing more." (Italics mine.) (*Caleca* v. *Caleca*, 101 N. Y. S. 2d 857, 858.) From the word "only", the inference is that here the Official Referee found no surrounding circumstances which gave support to the "facts" relied upon by the plaintiff.

But in the majority of cases there are surrounding facts and circumstances entering into the picture which may strengthen or weaken plaintiff's claim. For instance, were the declarations of the defendant made under circumstances which marked them as pertinent, sincere and spontaneous, or were they artificially injected into an amicable assembly, like a bolt from the blue, with an obvious eye to future litigation and ultimate freedom? What were the circumstances which brought the witnesses and the parties together? Do they appear natural or arranged and forced? Did a witness, perchance, overhear a heated argument between the parties, or a declaration by the defendant without his knowledge of the listener's presence? Did the witness observe any conduct on the part of the defendant which gave substance to his confession? Does the witness testify to what he claims to have heard or observed with the conviction and assurance compatible with truthfulness; or does he tell it haltingly as though laboring under the handicap of apprehension and uncertainty; or does he recite it glibly as a tale learned by rote for the purpose of the courtroom? Was the confession made reluctantly, under great distress of mind from a sense of shame and humiliation of a disgraceful situation corroborated by circumstances and conduct such as to nullify any thought of collusion (*Baker* v. *Baker*, 13 Cal. 87 [1859])? I appreciate these inquiries are open to the criticism that a court might be misled by a carefully conceived and skillfully acted fabrication, but that is true to some extent in all litigation. I am satisfied that these and kindred inquiries are rele-

vant and may supply the " other satisfactory evidence of the facts " equal to, or exceeding in weight, the scar testimony accepted by the majority of the Court of Appeals as sufficient within the meaning of the section (*de Baillet-Latour* v. *de Baillet-Latour, supra*).

So, too, the fact that there are no children born or conceived of a union, while in no way conclusive, has some weight in a case based on refusal to live normally that children may be born. And the time element impresses me as very important. Certainly a plaintiff's cry of fraud is not strengthened if he or she has allowed years to elapse before discovering deceit in the initial promise and the later excuses for nonfulfillment of a duty so inextricably a part of marriage as the rearing of a family, or of any promise which was made a condition of consent. In such cases, it takes strong evidence to overcome the suspicion raised by long delay, and the thought that the fraud alleged is but a mask to hide the real cause of dissension and beguile the court into action.

Long experience has convinced me that any fair and reasonable interpretation of section 1143 must take into consideration any circumstances surrounding the declarations relied on, and that those circumstances must be sifted and weighed to determine whether they constitute that " other satisfactory evidence of the facts" which must be produced in addition to the confessions, to justify a judgment in favor of the plaintiff; or whether they fail to buttress them by reason or credibility, or even weaken and undermine the alleged " facts " upon which a plaintiff pins faith, in either latter event indicating a dismissal of the complaint. To this effect the courts have held down through the years. (See review of case law of New York and foreign jurisdictions in *Zoske* v. *Zoske,* 64 N. Y. S. 2d 819.)

I cannot bring myself to believe, without further appellate judicial clarification, that the thousands of annulments which have been granted by able jurists over a long period of time have been based on a false premise. If so narrow a construction were to be placed on section 1143 as to demand direct corroboration going to the very heart of the alleged fraud, rarely could *honest* proof be given which would justify a decree in cases predicated on marital relations. In my opinion, such a requirement would breed deceit and collusion rather than guard against it. It would be tantamount to saying that the Legislature was either so stupid or so cunning in drafting this section that it offered its citizens but a hollow shell with no substance. More persuasive than this, is the warranted assump-

tion that, if the long procession of case law were so out of step with legislative intent, our lawmakers would have moved long since to make their meaning and purpose more clear and specific. The very fact that they have not done so lends credence to the theory that they recognize that the successful administration of a law governing the most intimate relations of man and woman must have a certain elasticity and depend in part on the discretion and integrity of the court. Annulment is not a relief granted promiscuously as a matter of right. The statute provides such an action " may be maintained ", which is equivalent to saying that the burden is on the plaintiff to present the proof, and on the court to weigh it before relief is forthcoming. The Court of Appeals spoke to the same effect in the de Baillet-Latour case (supra, p. 434) when it referred to the " other material from other sources " in addition to the declarations, " substantial and reliable enough to satisfy the conscience of the trier of the facts ". (Italics mine.)

A careful re-examination of the law, and particularly this late pronouncement of New York's highest tribunal, reveals nothing which alters the opinion to which my study of the subject had led me when, in September, 1946, I wrote: " The Court before whom the particular suit is presented has some discretion as to the amount and calibre of the corroborative proof necessary, but has no discretion to override the statute and dispense with it altogether. A Judge is human and not immune to error. This salutary requirement shields him from the dangers, and relieves him of the burden, of substituting his impressions and inferences for substantial proof. On the other hand, the ingredients of corroboration are not so circumscribed as to be unattainable. Sigel v. Sigel, Super. Ct., 20 N. Y. S. 377, 47 N. Y. St. Rep. 397. * * * The nature of the domestic relationship is such that it is often difficult to secure corroboration complete in all details and, in order that the requirement of § 1143, which is provided as a shield, may not be converted into a sword, a Court, if satisfied of the honesty and integrity of the witnesses testifying to the confession or admission, may grant the relief prayed for upon slight corroboration under the rule that ' equity will intervene to grant relief where necessary to undo or prevent the consummation of a fraud.' * * * The Bench and Bar, guardians of law and human rights, must be vigilant to the end that neither should collusion be attended with success and dissolution lightly accomplished, nor an honest petitioner penalized for inability to produce full corroboration of his claim. No sharp line of demarcation can be drawn between cases which

meet the letter and intent of the Statute and those which fall short. In surveying the ' other satisfactory evidence ' which constitutes corroboration, as in determining the materiality of a specific fraud, ' The boundaries  *  *  *  must be picked out by individual decisions ' (*Shonfeld* v. *Shonfeld,* 260 N. Y. 477, 481, 184 N. E. 60, 62), always bearing in mind that *the question is not whether any ' other satisfactory evidence ' is required, but whether it is sufficient.* The amount and character required is in inverse ratio to the circumstances, probability and strength of the plaintiff's cause, but it must be present.'' (*Zoske* v. *Zoske,* 64 N. Y. S. 2d 819, 833, 834, *supra.*)

My attention has been called to the fact that, with a view to providing a further safeguard, a practice has grown up in the county of Westchester in which the courts, in dealing with default annulments based on alleged premarital fraudulent promises, require the plaintiff to subpœna the defendant where available, or, if not, to offer satisfactory explanation of the failure so to do. This not only enables the judge presiding to afford the defendant an opportunity to controvert the charge if he or she so desires, but at the same time, perchance, the judge may remove or confirm any doubt arising in his own mind as to the plaintiff's version of the facts.

Upon reflection, this practice impresses me as so salutary a safeguard, that its adoption as a rule of practice should be given serious consideration. I believe it would go far toward assisting a judge in reaching a determination, and toward strengthening public confidence in the justice of the result, to say nothing of the effect it might have in deterring plaintiffs from presenting claims divorced from the actual facts and the truth.

Turning our attention to the case at bar, the record here is an example of those cases where an attorney fails to develop the details and surrounding circumstances sufficiently to give the court the benefit of plaintiff's version of the entire sequence of events. For instance, were it not for the testimony of the mother, we would have been completely in the dark as to plaintiff's bruised and bleeding face, the ring episode, and her accompanying hysteria which were a part of their final interview. In observing and listening to the witnesses on the stand, I was convinced of their truthfulness. The mother said her daughter " is a very peculiar girl and she keeps everything inside ''. The plaintiff impressed me as a serious-minded, honest but reticent young woman. While she acceded for a time to defendant's insistence on contraceptives after their marriage, remembering

the economic strain of these expensive years on a young couple who have not firmly established themselves, I believe the arguments for delay advanced by the husband may have appealed to her as based on sufficient reason to cause her granting his request for a time, and were such as might mislead a reasonably prudent person in a like situation. This was not a hasty marriage. She had known her husband for three years and doubtless at this stage had confidence in his integrity. Moreover, this is a case where, as soon as the apartment on which he had placed such stress was available, and he came forth with a further excuse for procrastination, she forced the issue and, on hearing from his lips that his promise to live with her so that children might be born was but a fabrication spun for the sole purpose of luring her into marriage, she left him. Granting that intent on his part to have a family at some time might seem implicit in the words attributed to him by his wife, " We will wait until the end of the year before starting having a family ", and also from the mother's testimony that he said he was not ready to have children, nevertheless, we should bear in mind that both testified he declared he did not want children, and also that the plaintiff had for eighteen months experienced his glib excuses and continuing delay. On the whole picture it is not surprising her credulity was strained to the breaking point. It appears to me that the wisdom of her refusal to return under the conditions he would have imposed, and her insistance on immediate proof of his good faith, was demonstrated by the reply she says he made to the effect that his marriage had been predicated on a desire to be a companion, and not the father of her children. Certainly the fact that, when he found his excuses had lost their power, he tore from her finger the rings which had sealed their betrothal and union, and left, not to return, is eloquent corroborative evidence that he then and there, in a tense, spontaneous situation, obviously unstaged and unrehearsed, by word and act, demonstrated that he had no intention to live with her normally in accordance with his promise and her insistence. Even were it to be argued that his conduct on that occasion sprang from anger, and was not conclusive of the facts — his fraudulent representations and refusal to fulfill — it was so interlocked in point of time and implication with the subject matter of their quarrel that, in my opinion, it supplies that " other satisfactory evidence of the facts " required by statute. In this case the declarations and acts to which the mother testified, took place in her own home, which makes her presence natural, believable and to be expected, thus adding another element of

strength to plaintiff's case. Moreover, although the defendant did not answer or appear personally in court, he served notice of appearance through an attorney who stated in open court that he appeared " In the action generally. He (defendant) said he wanted someone here to see what was going on."

I am convinced that here we have " other satisfactory evidence of the facts ", in addition to the declarations and confessions, within the meaning of section 1143 of the Civil Practice Act and respectfully recommend that the relief prayed for be granted.