[Civ. No. 19413.   Second Dist., Div. Three.   Apr. 9, 1953.]

EILEEN MASLOW, Appellant, v. WALTER MASLOW, Respondent.

David Silverton for Appellant.

No appearance for Respondent.

VALLÉE, J.—Appeal by plaintiff from a judgment denying her an annulment of her marriage to defendant. The complaint alleged that defendant, for the purpose of inducing

plaintiff to consent to the marriage, falsely and fraudulently represented to plaintiff that he desired to have children with her and to raise a family; she believed the representations; if they had not been made she would not have consented to the marriage; the representations were false in that defendant did not intend to have children with her; and defendant "at no time had any intention of raising a family or having children with the plaintiff." Defendant defaulted.

The parties were married August 17, 1951, and separated March 30, 1952. The evidence consisted of the testimony of plaintiff and her mother. Plaintiff testified: "Q. Will you please tell the court the circumstances under which you separated. A. Well, I had an argument with Walter, my husband, and that was about raising a family and having children. He didn't want a family and I did and I told him I wanted to start having one and he says that he doesn't intend to and he never intended to. I asked him whether he felt that way before we were married and he said he did. So, I asked him why he married me; why he didn't tell me that before we were married. He said, 'Well, if I told you I knew that you wouldn't marry me.' And that was it. Q. If you had known of his intent in that regard, would you have married him? A. No, I wouldn't. Q. After you learned of that intent, did you continue to live with him? A. No. Q. Did you feel that that was a very vital thing to your marriage? A. Yes. Q. A very vital part of it? A. Definitely . . . THE COURT: Well, you lived together for some five or six months, didn't you? A. Yes. Q. Have intercourse all that time? A. Not too often. Q. But, you did from time to time? A. Yes. Q. BY MR. SILVERTON [Attorney for plaintiff]: Did he require the use of anything during those periods, on those occasions? A. Yes. . . . Q. On those occasions when you did engage in matrimonial intercourse did he require the use of a contraceptive? A. Yes. Q. Did he refuse to engage in such activities with you unless contraceptives were used? A. Yes. Q. This conversation concerning raising a family, did that arise on account of the use of such contraceptives? A. Yes."

Plaintiff's mother testified: "Q. BY MR. SILVERTON: Now, did you have a conversation with your daughter when she separated from her husband? A. Yes, sir. Q. Where was the conversation you had with the plaintiff? A. In my home. Q. I see. Did she tell you of her conversation with her husband? A. Yes, sir. Q. And what did you do when she told you of that conversation? A. Well, I was upset and I got in

touch—I believe I called their home. He was supposed to come over and have dinner with us and I called him and I was surprised to know that they quarreled and that they weren't happy together because of—— Q. Mrs. Wool, I just want you to tell me of your conversation with him after your daughter told you about her conversation. What did you say to him? A. I said, 'Walter, Eileen tells me that you never intended to have any children and is that true?' And he said, 'Yes.' And I said, 'Did you have those intentions before you married my daughter?' And he said 'Yes.' And I said, 'Well, you know that Eileen would not have married you if you did not want to raise a family and neither would we consent to it.' Q. What did he say? A. Well, he said he just wanted to marry her and he didn't want to make an issue of that at all. He thought she wouldn't marry him if he had said anything like that. Q. And what did he say to you particularly with reference to raising a family? A. Well, he told me of their personal experience, that she had tried— you will pardon me—and that he was very sore at her. He always told her to use contraceptives and that one time she sort of wanted to put it over him and he was very sore at her and that is what started their argument."

The court found that defendant did not falsely or fraudulently represent to plaintiff that he desired to have children with her; that plaintiff was not induced to consent to the marriage by said representation; that it was not true that defendant did not intend to have children with plaintiff; and that it was not true that defendant, "at no time had any intention of raising a family or having children with the plaintiff."

Plaintiff contends that on the evidence she was entitled to a decree of annulment as a matter of law.

One of the prime purposes of matrimony, by the laws of nature and society, is procreation. Ordinary marriage relations between husband and wife are the foundation on which the perpetuation of society and civilization rests. ██  Implicit in the marriage contract is the representation that the parties will have normal and natural marital relations and that they will not do anything which will frustrate the normal and natural result of those relations. (*Millar* v. *Millar*, 175 Cal. 797, 803 [167 P. 394, Ann.Cas. 1918E 184, L.R.A. 1918B 415].) One spouse is defrauded when the other at the time of the marriage has no intention of having natural marital intercourse which might result in the birth of children.

242

■ A promise by one spouse before the marriage, express or implied, to have children, without any intention to keep the promise, is a sufficient fraud to void the marriage. The fraud consists of the promise to have normal and natural relations without any intention of keeping the promise and with the intention to deceive the other spouse. (*Millar* v. *Millar,* 175 Cal. 797 [167 P. 394, Ann.Cas. 1918E 184, L.R.A. 1918B 415]; *Aufort* v. *Aufort,* 9 Cal.App.2d 310 [49 P.2d 620]; *Bruce* v. *Bruce,* 71 Cal.App.2d 641, 644 [163 P.2d 95]; cases collected—4 A.L.R.2d 227.)

■ When after marriage one spouse uses contraceptives and the other spouse does not object, it may be inferred that this is what the latter spouse expected or that he or she is not the victim of misrepresentation. (*Gerwitz* v. *Gerwitz,* 66 N.Y.S.2d 327.) The duration of the practice and the moral standards of the parties are factors to be considered in drawing such an inference. ■ On the other hand when one spouse promptly objects to such practices and shows his or her resentment by refusing further intercourse under such conditions, the court may reasonably conclude that that spouse has been defrauded. ■ When one spouse mildly objects but continues the restricted intercourse for a period of time and then claims fraud, the court is justified in concluding that he or she is not the victim of fraud. (*Stegienko* v. *Stegienko,* 295 Mich. 530 [295 N.W. 252]; *Witten* v. *Witten,* 109 N.Y.S.2d 254; *Richardson* v. *Richardson,* 103 N.Y.S.2d 219; *Schwind* v. *Schwind,* 99 N.Y.S.2d 108; *Riley* v. *Riley,* 89 N.Y.S.2d 347; *Hafner* v. *Hafner,* 66 N.Y.S.2d 442.)

■ Subsequent failure to fulfill prenuptial promises, express or implied, does not necessarily establish that a spouse had no intention of performing his marital obligations at the time the marriage was performed. (*Bragg* v. *Bragg,* 219 Cal. 715, 720-721 [28 P.2d 1046]; *Schaub* v. *Schaub,* 71 Cal.App.2d 467, 476 [162 P.2d 966].) ■ An admission by a defendant in an annulment action should be received with "particular caution" in order to be sure that parties, by collusion, are not thus seeking to annul a marriage in fact valid. (*Maduro* v. *Maduro,* 62 Cal.App.2d 776, 780 [145 P.2d 683].)

■ When the parties have voluntarily cohabited as husband and wife with full knowledge of the facts constituting the fraud, right to annulment is lost. (Civ. Code, § 82.)

■ The presumption is against fraud and it is not overcome by shadowy evidence. (*Shapiro* v. *Equitable Life Assur. Soc.,* 76 Cal.App.2d 75, 91 [172 P.2d 725].) ■ Proof of

fraud must be clear, convincing, and satisfactory to the court. (12 Cal.Jur., 832, § 81.) ▆ And whether the evidence is clear and convincing is primarily a question for the trier of fact. (*Baines* v. *Zueback*, 84 Cal.App.2d 483, 488 [191 P.2d 67]; *Riesenberg* v. *Riesenberg*, 97 Cal.App.2d 714, 716 [218 P.2d 577].) ▆ Where the evidence will support different inferences, the choice of inferences is for the trial court; and its finding, based on the inferences drawn, cannot be disturbed on appeal. (*Bruce* v. *Bruce*, 71 Cal.App.2d 641, 644 [163 P.2d 95].) ▆ The trier of fact is the *exclusive* judge of the credibility of the witnesses. (Code Civ. Proc., § 1847, *Hicks* v. *Reis*, 21 Cal.2d 654, 659 [134 P.2d 788].) ▆ The trial court is free to disbelieve and reject the testimony of witnesses even though they are uncontradicted and unimpeached. (*Lohman* v. *Lohman*, 29 Cal.2d 144, 149 [173 P.2d 657]; *Odenthal* v. *Lee*, 113 Cal.App.2d 666, 669 [248 P.2d 937]; *Manha* v. *Grass Valley Meat Co.*, 113 Cal.App.2d 773, 778 [249 P.2d 45].) ▆ These rules apply with particular emphasis to an action for annulment since the state is a silent but active third party to every action to dissolve a marriage. The state is interested in seeing to it that no marriage is declared void as a result of fraud or collusion, and that the statutory grounds on which the annulment is sought actually do exist. (*Maduro* v. *Maduro*, 62 Cal.App.2d 776, 779 [145 P.2d 683].)

▆ Annulment is not a relief granted promiscuously as a matter of right. The cold record cannot give the look or manner of the witnesses; their hesitations, their doubts, their variations of language, their precipitancy, their calmness or consideration. A witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression. ▆ Did plaintiff and her mother testify with the conviction and assurance compatible with truthfulness; or did either of them give testimony haltingly as though laboring under the handicap of apprehension and uncertainty or did either of them give it glibly as though a tale learned by rote for the purposes of the courtroom? These are questions which can only be answered by the trier of fact. The court having seen and heard the parties may well have concluded that there was collusion; that the plaintiff's testimony was a fabric of fancy and exaggeration woven to lift her from bonds now distasteful; and that the testimony of plaintiff's mother was a recital of rehearsed evidence.

The trial judge found the evidence to be unconvincing and insufficient. Plaintiff testified she discovered the alleged fraud more than six months after the marriage. It is obvious from her testimony that she must have discovered it sooner. She continued to live, cohabit, and have restricted intercourse with defendant with full knowledge of the facts constituting the alleged fraud for a period of several months. Had plaintiff's eagerness for children been as real as she now claims, it is difficult to see why, in face of defendant's persistent procrastination, she had to wait for him to put into words what his conduct so loudly proclaimed. A reasonable inference is that if she were really deceived she would not have tolerated the claimed situation for an instant. We cannot say, as a matter of law, that there was fraud; or if there was, that it was not condoned. (See *Maduro* v. *Maduro,* 62 Cal.App.2d 766 [145 P.2d 683].)

Affirmed.

Wood (Parker), J., concurred.

SHINN, P. J.—I dissent. There is no doubt as to the rule of law which plaintiff invokes. Anyone who is aware of the fact that it is the married people who have the children would know that one of the primary objects of marriage is the raising of a family. There is but one question on this appeal and a simple one at that. It is my understanding of the law that the courts belong to the people and that when a litigant makes out a complete case by clear, positive and credible evidence, untainted in any respect which would afford a reasonable ground for rejecting it, relief should be granted as of right. Plaintiff made out such a case. No woman in her situation could have proved a better one. If this judgment is to be affirmed it would mean that trial courts can nullify the law by denying annulment of marriages in any case by merely saying: "I am not convinced." I cannot have a part in leaving plaintiff in the cruel position of being married to a would-be actor (which defendant was shown to be), who cannot be bothered with children around the house. If the law has an interest in preserving the marriage relation, it should, and does, frown on pseudo marriages such as the present one in which plaintiff is an unfortunate prisoner.