Filed 10/4/13  In re Mirasol F. CA2/2
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MIRASOL F. et al., Persons Coming Under the Juvenile Court Law. | B244609<br>(Los Angeles County<br>Super. Ct. No. CK04949) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSE F.,<br><br>        Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Marilyn Mordetzky, Juvenile Court Referee.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kimberly A Roura, Associate County Counsel, for Plaintiff and Respondent.

_____

Jose F. appeals from a juvenile court finding of dependency jurisdiction over his two daughters. (Welf. & Inst. Code, § 300.) He challenges the court's evidentiary rulings, and the sufficiency of the evidence supporting jurisdiction. We affirm.

## FACTS

Jose F. (Father) is the presumed father of Marisol F. (born in 1996) and R.F. (born in 1998) (collectively, the children). In a prior case, Marisol was declared a dependent child in 1998, because she and an older sibling were physically abused by their mother (Mother); exposed to domestic violence; physically abused by Mother's male companion; and the family home was filthy and unsanitary. In 1999, R. was declared a dependent child owing to Mother's physical abuse of her siblings; Father's failure to protect; a filthy home; and Mother's failure to reunify with her older children.[1]

In October 2011, the children were detained after the Department of Children and Family Services (DCFS) learned that R. was physically and emotionally abused by Mother, placing Marisol at risk of harm. Mother threatened to kill R., pulled the girl's hair, and yelled epithets at her. R. was relieved to be placed in foster care due to Mother's constant threats, emotional abuse and yelling. Marisol photographed R.'s injured eye after Mother threw a soup package and hit R. in the face. A family preservation agency made a "risk alert report" after Mother repeatedly spit at R. and threw a bucket of water at her.

At the detention hearing, Mother's attorney disclosed that Father and Mother were never married. Father occasionally visits and the children recognize him as their father. He sometimes took them shopping but did not pay child support. Though the children wished to return to Mother, the court viewed the situation as dangerously unstable and found a prima facie case for detention. Father was authorized to have monitored visits once he contacted the court or DCFS.

---

[1] Mother lost parental rights to two older daughters in 2001. She is not a party to this appeal.

2

A petition was filed on behalf of the children on October 31, 2011, alleging physical abuse by Mother; failure to protect; and abuse of sibling. In an interview, 15-year-old Marisol described a tense relationship between Mother and R. Mother "hits [R.] because they hate each other and they talk back to each other." When Marisol was younger, Mother "would hit me a lot. Since I went back to her she only grabs and pinches my arm." Marisol used to see Father every three weeks, but now he does not answer his phone. R. told the social worker that she is in foster care because Mother bruised her face with a soup package. Though Mother threatened to kill her, R. believes that "she only says that to scare me. When she says she is going to kill me she means that she is going to punish me or hit me." The girls do not fear Mother and wished to return home.

Mother agreed that she spat in R.'s face, after the girl "spat at me." She accused R. of fabricating the rest. She denied pulling R.'s hair or hitting her in the face, blaming a pet dog for the marks on R.'s face. Mother stated that R. "lies a lot" and has "bad friends." R.'s therapist stated that the girl told her that Mother hit her in the face with a packet of soup. There is ongoing conflict between R. and Mother. Mother has labeled R. as the "bad" child and Marisol as the "good" child.

The foster mother indicated that Marisol (1) falsely said that she had to stay at school until 6:30 p.m., and (2) signs R.'s progress reports so that the foster mother won't see them. Mother's former housemate reported that a month or so before the children were detained, Mother "grabbed R. by the hair and dragged her through the house, also pulling her by the arm forcefully." Mother "speaks to the girls in bad words" and threatened to take them to Mexico once she regained custody, to punish them for reporting her abuse.

An assessment team met with the family on November 22, 2011. Father's whereabouts were unknown, so he did not participate. The family history of domestic violence and reported sexual abuse was discussed. Marisol was detained from Mother at age two, and R. was detained at birth. Mother met court requirements in the prior dependency case and reunited with the children two years after they were detained. Her

older daughters were adopted 10 years ago: the children have had no contact with their older siblings, and long to meet them. R. claimed to see Father every weekend, but Marisol saw Father sporadically and had no contact with him in some time. Both children expressed a desire to return home. Marisol is focused on her future and career goals. R. was described as defiant, controlling and demanding. She has problems with impulse control and manipulates Marisol. Both children described sexual abuse by strangers when they were small. They had difficulty adjusting to rules set by the foster parents.

Father came to DCFS on January 24, 2012, to discuss the case. He is the youngest of 20 children from a ranching family in Mexico. He trains horses. He would like to provide ongoing support for the children but Mother does not allow it. Father denied drug or alcohol abuse, or domestic violence.

At a hearing on January 26, 2012, Father asked the court for custody of the children, as a nonoffending parent. Over the objections of DCFS, the court released the children to Father's custody. During a social worker visit, R. stated that she was happy at Father's home, but Marisol accused Father of being a liar and expressed a preference for Mother, who "lets us do what we want." The social worker opined that the children were prematurely released to Father: he has not lived with them since they were little and has no experience raising children, let alone "strong-willed teenagers."

Mother waived her right to a trial. On February 2, 2012, the court sustained an allegation that a parent-child conflict exists between the children and Mother that led to inappropriate discipline such as Mother pulling R.'s hair and slapping her. This places the children at substantial risk of harm. The children were declared dependents of the court and Father was given custody, under DCFS supervision. The court ordered individual counseling for the children. The children's therapist began helping them adjust to living with Father.

On February 28, 2012, the police received a report from Father of a possible rape. They found Marisol with self-inflicted cuts on her arm: she stated that "she wanted to feel pain and she did not want to live anymore" because she was having problems with

4

her family.  Marisol was hospitalized because she posed a risk to herself.  During her hospitalization, Marisol displayed signs of adjustment disorder and depression.  She denied being raped and told the police that she had consensual sex with a boyfriend.  After discharge, she continued to meet with her therapist to address coping skills, depression, and family differences.

Social workers scheduled two meetings with Father at his home; he failed to show up for either meeting.  As a result of his "unexcused abuses and minimal commitment to the program," family preservation services were terminated in April 2012.  Father appeared to be unable to parent the children:  he lacked adequate beds for them; there was a limited food supply in his home; he did not ensure the children's attendance at school; he left the children unattended for hours; and he returned home intoxicated.  Father did not see any need to obtain mental health services for the children.

On June 22, 2012, DCFS filed a subsequent petition for the children alleging that Father sexually abused R. and caused the children to consume alcohol.  In the detention report, 13-year-old R. described inappropriate touching by Father beginning in March 2012.  Father made her massage his chest and back while she straddled him, and he pushed her down his torso to be on top of his genitals.  She felt him "getting hard."  He lay on top of her, placed his penis against her vaginal area and humped her.  Father fondled her breast while inserting his hand under her clothing, rubbing her vagina and placing his fingers inside of her.  On at least one occasion, Father came into her room, pulled down her pants and underwear and orally copulated her.  R. is afraid of Father because he told her he has raped girls.  He described how he has sex and how he enjoys orally copulating women.  At times, Father placed R.'s hand inside his pants while touching her vagina.  When she asked, "Dad is this right?" he responded, "Yes it is right and you can't tell anyone or they are going to take me to jail and I won't be able to give you money anymore."

Father is frequently gone and returns home drunk.  He leaves the children no food in the home, and gave them tequila to try.  Marisol denied sexual abuse.  However, she saw R. straddling Father while massaging his chest; saw Father lie on top of R.; saw him

spank R.'s bottom; and saw him get really close to R. R. privately disclosed to Marisol that Father kissed her, orally copulated her, and touched her breasts several times. Marisol was uncomfortable because Father said he had raped a girl and described how he has sex.

Father maintained that the children are lying. A few days earlier, R. asked him for money. When he refused, she became upset and threatened to report him for sexual abuse. He believes that the children "have a history of doing favors for money and asked R. to massage him to test her reaction." He opined that the children "are sexually smart and know more than they should know about sex." He suspects that the children have sexual relations with each other, and he got rid of R.'s dog because he found her in bed with the animal.[2] Father believes that the children are sexually active because they call boys in the middle of the night. He never touched the children or described his sexual encounters to them, nor did he tell them he raped anyone. He denies offering them tequila. Father was arrested on suspicion of child abuse.

The children did not report sexual abuse to their counselor or to Mother. Mother was not sure whether to believe R. because the child makes up lies to manipulate. The counselor had specifically asked about abuse, and the children's only complaint was that Father makes them clean the house and does not let them go out. Father complained to the counselor that the children are "boy crazy" and out of control. The court found a prima facie case for detaining the children from Father. The criminal case against Father was dropped because the district attorney felt that R. was "vague and inconsistent" about the abuse and that proof of abuse could not be shown beyond a reasonable doubt.

In a July 2012 jurisdiction/disposition report, R. stated that Father touched her starting in March, two months after she was placed in his care. He initially kissed her on the mouth. Subsequently, "he touched inside me with his hand and his mouth." He touched her breast and orally copulated her. She told him to stop but he refused. Both

---

**2**     Father later told the social worker, "I took away the dog because she was having the dog lay in between the legs underneath the covers and she was pale."

6

children confirmed that R. informed Marisol about the abuse. They claimed that Father urged them to try tequila and they did.

The police report made on June 19, 2012, repeats much the same information. Father first kissed R. on the mouth. Later, he fondled her breasts, reached beneath her underwear and rubbed her vagina. After that, he became very "touchy" and flirted with her. He asked for massages and would make her straddle him while he pushed her down so that her vagina would be over his penis, while clothed. She could feel his erection and he would move her back and forth on top of him. He humped her on another occasion while groping her buttocks. She tried to fight him off but was not strong enough. In May, Father began penetrating her vagina with his fingers during massages while she straddled him. She could feel his fingers inside her for approximately five minutes. Marisol was usually home, but was in her bedroom and unaware. Once when Marisol was not home, Father approached R., removed her clothing from the waist down, and orally copulated her. She was so scared that she did not fight him. The abuse began in March and ended on June 14. She is not sexually active. She is uncomfortable with Father, who accused her of having sex with the family dog and accused her of prostitution because she wore short shorts. He was frequently drunk, encouraged the children to try tequila, and made comments about regretting having raped girls in the past. R. decided to report Father "because she is afraid he will continue to sexually assault her and feels she will eventually get raped, as he has been progressively doing 'more things' to her." He threatened her not to tell anyone what he did to her. Marisol confirmed that Father got drunk, made statements about raping girls, and was very "flirtatious with the victim," lying on top of R. and "grabbing her butt." Marisol tries to avoid Father by staying in her room as much as possible.

In an interview, Father indicated that he already knew where to do court-ordered programs. He no longer wants custody of the children or reunification. He opined that the children are spoiled and unredeemable, "like a horse that has gone bad." The children's therapist stated that neither of the children disclosed sexual abuse to her and she did not know why they would make allegations against Father.

7

A forensic examination on R. indicated that there are signs of sexual abuse, i.e., a cleft to the base of the hymen. R. provided "lots of details" during the exam regarding Father's sexual abuse and cried during her interview. She described massaging Father while straddling his lap, stating, "I could feel that his penis was hard, so I got up right away." She also stated that Father "put his mouth on my private" after removing her pants. R. denied being sexually active, stating "I've always wanted to wait until I get married." While R. disclosed digital penetration by Father, the examiner believed that she was "holding back" information, adding that "I don't think a child would make that up." R. "shows signs of a rape victim as witnessed by her reaction to questions asked."

DCFS believed that the sexual abuse allegations are likely true, based on the police report and the forensic examination. Father made inappropriate sexual remarks saying that he "tested" R. to see if she would perform sexual favors for money; accused the children of sexually stimulating each other; and stated that R. allowed the family dog to orally copulate her. DCFS found Father's comments "extremely odd and quite stunning." Father never previously mentioned any inappropriate sexual behavior by either of the children, despite having contacted the social worker on a personal cell phone at 10:00 p.m. to ask whether the children could visit a friend's home. Father never disclosed the children's alleged sexual behavior to the therapist who came to the family home, making it appear that he was fabricating stories to damage the children's credibility. The social worker observed that R. was "primped and pretty as though [Father] was courting" and grooming her for abuse while Marisol "was not treated in such a favorable manner."

In August 2012, DCFS reported that Father does not desire custody of the children and blames them for the issues that caused them to be re-detained. He has not visited the children or started services to mitigate the factors that led to the petition. He refused to abide by court orders to participate in therapy, a mental health evaluation or sexual abuse counseling because he denied any wrongdoing. He accused the children of lying and refused to meet with the social worker.

At trial, R. testified that she was uncomfortable living with Father because of "him touching me" in a sexual manner on her breasts and bottom. The first time he touched her intimate parts was on a night when he asked to sleep on the floor next to her bed, telling her he wanted to watch her television. In the morning, he got in her bed and touched her private parts under her pajamas: she told him to stop because she did not like it.

After that incident, there were times when he would open R.'s legs and get on top of her while dressed and rub against her. This occurred around 10 times. She did not disclose the abuse to the family preservation worker or her therapist. Eventually, R. reported it "because I was getting tired of him doing it to me, and then I realized that I needed to tell because he would probably rape me or something. I was scared." He gave her alcohol to drink, though not while he was touching her. R. denied making up accusations as a way of moving away from Father.

On questioning by another attorney, R. clarified that before Father touched her private parts, "he kissed me" in her bedroom. On another occasion, when Marisol was away at a party, Father removed R.'s pants and underwear and inserted his fingers into her private parts. She told him to stop and yelled, but he continued touching her until she kicked him. He put his mouth on her vagina one time, and massaged her breast and butt. On five occasions, R. massaged Father's chest and back, at his request, and sometimes he would give her money. When she refused, he told he was not going to buy her things anymore. Though she sometimes straddled him during the massages, she denied being on top of his privates.

Father accused R. of "being a prostitute" and having sex with boys, which he assumed because "he just had a dirty mind." When R. told Marisol about the abuse, Marisol said, "Well, you play with him too much, and that's why he touches you." At trial, R. denied ever having sexual intercourse with anyone. On one occasion, Father poured her a half inch of alcohol in a glass and she drank it all but found it "weird and nasty." She did not wish to drink, but Father was adamant.

9

Marisol testified that R. told her that Father touched her in a way that made her uncomfortable, "that he touched her on her butt, and then he used to go on top of her." This was in April or May of 2012. Marisol advised R. not to "play" with Father and to avoid sexual touching, "you just need to be away from him." On one occasion, Father came into Marisol's room late at night, drunk, with his belt unbuckled, which frightened her. Father did not touch Marisol inappropriately.

Marisol was aware that Father asked R. to massage his chest and back: Marisol thought it was inappropriate to see R. straddle Father during the massage sessions. R. straddled Father's front side to massage his chest. Marisol saw Father once pay R. $20 for a massage. Marisol thought it was odd that he only asked R. for massages.

R. informed Marisol that Father "took her pants off and opened her legs and started fingering her" in the living room, and that he got into her bed and touched her. R. told her sister that Father asked for a kiss. Though R. said no, he still kissed her on the mouth. On one occasion, Father and the children were watching television together: both children saw Father put his hands inside his pants, and R. commented, "Look, the blanket is moving" and they believed that he was touching himself. Marisol testified that Father got rid of the family dog because "he said that maybe my sister was having inappropriate things with the dog." Father urged the children to drink tequila with him, and they did. Marisol thought it tasted strong and "nasty." Marisol never heard R. threaten to report Father to a social worker or demand money from him.

In his testimony, Father stated that the children came to live with him in September, but he could not remember which year, or if it was within the last 12 months. He denied kissing R. on the mouth, or touching her breasts or vagina, or orally copulating her. He said these are all lies. He agreed that R. massaged him six times, while he was sitting on the sofa or lying on the floor, and once he paid her eight dollars. R. was on top of him. He did not like it when she sat across his lap for three or four minutes because "I had like bad thoughts." He moved his hips while she sat on his lap to move her. He never touched R. in a sexual way.

10

Both Father and the children agreed that R. hit Father, leaving bruises, and kicked him.  Father did not report this to the social worker.  Father denied ever raping anyone, or telling the children that he had done so.  He denied entering R.'s bedroom to watch television when Marisol was not present.

DCFS and the children's attorney asked the court to sustain the petition and deny reunification services.  Father's attorney argued that R.'s testimony was inconsistent and the child could have protected herself against Father because she was very violent.  Father "believes that he is being victimized by [R.] but holds no grudge and no resentment toward her, loves her, and believes that the relationship can be healed . . . ."  Father agrees that the massages and wrestling with R. were "a bad idea."

Ruling on the petition on September 14, 2012, the court stated, "I found [R.] to be very credible, and I found Marisol to be very credible" despite the difficult testimony.  Conversely, "I found the father's testimony to be so incredible—not credible to the point I believe he was making it up as he was going along. . . .  And the father even admitted to the fact that he allowed massages."

The court sustained allegations that Father sexually abused R. by orally copulating her vagina; simulated sexual intercourse by rubbing his penis against her vagina; fondled and digitally penetrated her vagina; fondled her breasts and buttocks and kissed her mouth; and forced her to massage him while she straddled his penis and stomach.  This sexual abuse endangers the physical health, safety and well-being of R. and places Marisol at risk of harm.  Moving to disposition, the court stated that the children are dependents of the court and removed them from Father's custody.  The court denied reunification services, noting that Father refused to admit that there was sexual abuse; therefore, completing classes or programs "would not make these children safe."  The court suggested that Father voluntarily participate in a sex-abuse counseling program for perpetrators.

## DISCUSSION

The disposition order is an appealable judgment.  (Welf. & Inst. Code, § 395; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 196; *In re Adam D.* (2010) 183 Cal.App.4th 1250,

11

1261.)  Reviewing jurisdictional findings and the disposition, we see if substantial evidence, contradicted or uncontradicted, supports them.  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'"  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Father contends that insufficient evidence supports the jurisdictional findings.  A child may be declared a dependent if he or she "has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent," or if the child's sibling has been abused and there is a substantial risk that the child will be abused.  (Welf. & Inst. Code, § 300, subds. (d), (j).)

Pointing to discrepancies, Father argues that the evidence in support of the judgment "is inherently improbable and physically impossible."  In other words, "'"no reasonable person could believe the testimony."'"  (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149.)  He mentions that R. was initially asked at trial when she started living with Father and answered "June."  When clarification was sought, R. correctly stated that she was with Father for about six months (January-June 2012), that she went to the foster home in June, and added that the abuse started about two months after Father took custody.  This is consistent with R.'s prior statements that the abuse started in March 2012.

R.'s trial testimony mirrors the reports taken by the police, the DCFS social worker, and the hospital where she was examined.[3]  By contrast, Father testified— incorrectly—that the children began to live with him in September and he could not recall

---

[3]     We note that the quality of the questioning was poor and confusing.  For example, Father's attorney asked R., "Was [Father] awake when he climbed into your bed or asleep?"  To no one's surprise, the answer was, "Awake."

the year or whether it was within the last 12 months. Father is not in a position to fault R.'s timeline, which is more accurate than his own.

Citing a few nuggets of information from various DCFS reports, Father insists that R. "has a history of lying, was upset with Father, and had a motive to make false allegations." He observes that she was a poor student, failed to do her homework regularly, hardly spoke in class, had a flat affect, and wore slightly inappropriate clothing to school. Further, one of Mother's male friends offered her money in the past to remove her clothing, and Mother and Father accused the children of improprieties.

Father's hard-hearted and pathetic criticisms of his daughter do not discredit her testimony. It would be perfectly reasonable for the trial court to attribute R.'s difficulties in school, first, to the abuse she suffered at the hands of Mother, who abused her physically and emotionally and threatened to kill her, and, second, to the sexual abuse she suffered at the hands of Father. Having parents who engage in reprehensible behavior would naturally cause any child to be distressed and distracted from schoolwork. Father appears to blame the victim for misconduct by Mother (who detailed her sexual experience to the children) and misconduct by Mother's male friend.

Father's after-the-fact accusations about R.—which he never reported to the child's in-home therapist or the social worker—ring false. His claim that she threatened to report him unless he gave her money is self-serving. Marisol never heard R. demand money from Father or threaten to report him for sexual abuse, even while disclosing Father's sexual behavior. For all of Father's accusations, there is no evidence that R. had sexual experience with anyone, save for the sexual abuse by Father. Father's ludicrous claim about the family dog boils down to seeing the dog in R.'s bed, and she was "pale." Given the evidence, the child's pallor could be attributed to fear that Father was planning to come in and molest her again.

The trial court is the sole trier of fact. "The trier of fact is the *exclusive* judge of the credibility of the witnesses. [Citations.] The trial court is free to disbelieve and reject the testimony of witnesses even though they are uncontradicted and unimpeached." (*Maslow v. Maslow* (1953) 117 Cal.App.2d 237, 243.) Inconsistent evidence that falls

13

short of physical impossibility, patent falsity or extreme outlandishness may be found credible. (*In re S.A.*, *supra*, 182 Cal.App.4th at p. 1149.) Thus, a child sex abuse victim may be believed by the court, even if her testimony is contradicted by her diary and she hid the abuse from her therapist. (*Id.* at pp. 1141-1143.) R. testified at length and was questioned by several attorneys. The court found R. to be a very credible witness. On the other hand, Father appeared to be fabricating his testimony, in the court's view. As Father concedes, a reviewing court has no opportunity to observe the appearance or demeanor of witnesses. (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 251.)

R. testified to multiple examples of sexual abuse within the meaning of Penal Code section 11165.1, including mouth-to-genital contact and intentional touching of her breasts and genitals. Any inconsistencies between the various reports were minimal. The trial court had all the reports and the trial testimony before it and discounted the minor inconsistencies.[4] Sexual abuse may be found even if the child victim's accounts "varied in the details." (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.)

"Under the guise of inherent improbability, [Father] invites us to usurp the juvenile court's factfinding role, which we decline to do." (*In re S.A.*, *supra*, 182 Cal.App.4th at p. 1150.) Nothing in the record makes the children's testimony "inherently improbable." Being a "strong-willed teenager" does not make a child a liar. Once the court found sufficient evidence to support a sustained finding of sexual abuse, it could also find that this abuse poses a risk of harm to R.'s sibling Marisol. (*In re Ricky T.* (2013) 214 Cal.App.4th 515, 517.)

Father maintains that the trial court prevented him from cross-examining R. and Marisol during trial. A judgment cannot be set aside "by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of

---

[4]     Contrary to Father's claim that the court needed psychological testimony, the court could not require a victim in a sexual assault case to submit to a psychological examination for purposes of assessing the victim's credibility. (Pen. Code, § 1112.)

14

justice." (Evid. Code, § 354; Cal. Const., art. VI, § 13.) In other words, erroneous evidentiary rulings are not a grounds for reversal if the error is harmless.

The court declined to allow Father, in his words, "the right to explore [R.]'s sexual activity with boys, her paid massages of her mother's lovers . . . as well as her accusation that Father called her a 'prostitute.'" He also wanted to question her about the "dog incident." This line of questioning was correctly rejected as irrelevant to the issue of whether Father molested R. (Evid. Code, § 352.) Only relevant evidence of significant probative value can be presented at a dependency hearing. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1068.)

Father did not make a written motion with an offer of proof before attempting to introduce evidence of a complaining witness's sexual history. (Evid. Code, § 783.) "With a witness under the age of 14 . . . the court shall take special care to protect him or her from undue harassment or embarrassment, and to restrict the unnecessary repetition of questions." (Evid. Code, § 765, subd. (b).) In any event, Father's counsel asked R. if she ever had sexual interactions with any person, and the answer was "No." R. also testified that Father's assumptions about her sexual experience were a figment of his "dirty mind." Thus, Father had an answer to his indiscreet questions about his child's sexual history.

Contrary to Father's claims on appeal, the trial court permitted him to ask Marisol about whether she believed R.'s accusations. Because the unrefuted testimony showed that Marisol was not present during the molestations, Marisol's speculation about whether they occurred was not useful. There was testimony from the children and Father that R. struck and bruised him, so Father's contention that he was prevented from eliciting this testimony is unfounded. Father's attempt to have Marisol testify whether they told their therapist that they did not want to live with Father was properly excluded as irrelevant to the issue of sexual abuse.

In short, Father was permitted to question the children extensively over the course of several days during trial. He then testified that all the accusations against him were lies. The court believed the children and disbelieved Father. Looking at the entirety of

15

the record and the trial testimony, any error in disallowing questions was harmless error and did not result in a miscarriage of justice.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*


_____

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16